**CASE NO. 23-1752**

IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

————————————

ANTHONY KELLY; GREGORY COOK; GERALD FAIR;
JACK HOFFMAN; CHRISTOPHER KUNKLE; DAVID PLUNKETT;
SAMUEL REYES; FREDERICK RUFF; MICHAEL SHARPE;
CHAD LALLIER,

*Plaintiffs-Appellants,*

v.

THE CITY OF ALEXANDRIA,

*Defendant-Appellee.*

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

————————————

**OPENING BRIEF OF APPELLANTS**

————————————

Robert W. T. Tucci
Gregg C. Greenberg
ZIPIN, AMSTER & GREENBERG, LLC
8757 Georgia Avenue, Suite 400
Silver Spring, MD 20910
301-812-4744
ggreenberg@zagfirm.com
rtucci@zagfirm.com

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1752__     Caption: _Anthony Kelly et al. v. The City of Alexandria_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Anthony Kelly, Christopher Kunkle, Gregory Cook, Gerald Fair, Jack Hoffman, Chad Lallier,_
(name of party/amicus)

_David Plunkett, Samuel Reyes, Frederick Ruff, and Michael Sharpe_

who is _____appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                    ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Robert W.T. Tucci                      Date:      August 1, 2023

Counsel for: Appellants

Print to PDF for Filing

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ...................................................................2

STATEMENT OF THE CASE ...............................................................2

SUMMARY OF ARGUMENT .............................................................10

STANDARD OF REVIEW ..................................................................14

ARGUMENT .....................................................................................15

    I.     THE DISTRICT COURT'S FINDING THAT THE CHIEFS
           WERE COMPENSATED ON A SALARY BASIS, AND THUS
           EXEMPT FROM THE FLSA'S OVERTIME PROTECTIONS,
           SHOULD BE REVERSED ....................................................15

          A.   The City Failed to Satisfy its Considerable Legal Burden of
              Proof While the District Court Failed to Properly Apply
              Those Standards to the Virtual Mountain of Contrary Facts
              and Evidence Presented by the Chiefs.............................15

              a.   The District Court initially recognized, but then failed to
                    properly apply, the City's general burden of proof.....................16

              b.   The District Court did not correctly recognize or apply
                    the City's burden to prove that the Chiefs "plainly and
                    unmistakably" fell within an overtime exemption under
                    the FLSA by "clear and convincing" evidence ............................17

              c.   The District Court failed to correctly apply the applicable
                    legal standards and ignored contrary facts presented by
                    the Chiefs.........................................................18

i

B. The District Court Erred in Granting Summary Judgment to the City Because the Chiefs, Not the City, Were Entitled to Judgment as a Matter of Law............................................................22

   a. The City failed to produce "clear and convincing" evidence that the FLSA overtime exemptions apply because the Chiefs are not "plainly and unmistakably" paid on a "salary basis." ...................................................................22

   b. The City failed to prove that there plainly and unmistakably exists an "employment arrangement" with the Chiefs that includes a "guarantee."........................................25

   c. The City failed to prove that the Chiefs plainly and unmistakably received "minimum guarantees" that were "paid on a salary basis." ..............................................................29

   d. The City failed to prove that the Chiefs plainly and unmistakably received a "real" structural "minimum guarantee."..................................................................................32

   e. The City failed to prove that the Chiefs are plainly and unmistakably paid a minimum salary "regardless of hours, days or shifts worked." ......................................................35

   f. The City failed to prove that there is plainly and unmistakably a "reasonable relationship" between any guarantee and the amount the Chiefs actually earn....................40

CONCLUSION ........................................................................................47

STATEMENT REGARDING ORAL ARGUMENT ...........................................47

CERTIFICATE OF COMPLIANCE......................................................................48

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................ 14, 16

*Brock v. Claridge Hotel & Casino*,
   846 F.2d 180 (3d Cir. 1988) ............................................. 46

*Carrera v. E.M.D. Sales Inc.*,
   75 F.4th 345 (4th Cir. 2023) ............................................ 17

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................ 14

*Clark v. J.M. Benson, Co. Inc.*,
   789 F.2d 282 (4th Cir. 1986) ........................................ 11, 16

*Corning Glass Works v. Brennan*,
   417 U.S. 188 (1974) ............................................................ 11

*Craighead v. Full Citizenship of Md., Inc.*,
   Civil Action No. 17-cv-595-PX, 2020 U.S. Dist. LEXIS 174747
   (D. Md. Sept. 23, 2020) ..................................................... 39

*Desmond v. PNGI Charles Town Gaming, L.L.C.*,
   564 F.3d 688 (4th Cir. 2009) ........................................... 18

*Duffie v. The Michigan Grp., Inc.*,
   No. 14-cv-14148, 2016 WL 28987 (E.D. Mich. Jan. 4, 2016) ........................ 34

*Encino Motorcars, LLC v. Navarro*,
   138 S. Ct. 1134 (2018) ...................................................... 17

*Gentry v. Hamilton-Ryker IT Sol., L.L.C.*,
   No. 3:19-cv-00320, 2022 U.S. Dist. LEXIS 38398
   (S.D. Tex. Mar. 4, 2022) .................................................. 43

*Guilbeau v. Schlumberger Tech. Corp.*,
   No. SA-21-CV-00142-JKP, 2023 U.S. Dist. LEXIS 117614
   (W.D. Tex. July 7, 2023) ................................................... 43

*Helix Energy Sols. Grp., Inc. v. Hewitt*,
   598 U.S. 39, 143 S. Ct. 677 (2023) ............................................. *passim*

iii

*Hewitt v. Helix Energy Sols. Grp.*,
    15 F.4th 289 (5th Cir. 2021) ........................................................ *passim*

*Hood v. Mercy Healthcare Arizona*,
    23 F. Supp. 2d 1125 (D. Ariz. 1997) ............................................ 41

*Hoschar v. Appalachian Power Co.*,
    739 F.3d 163 (4th Cir. 2014) ........................................................ 16

*Hughes v. Gulf Interstate Field Servs. Inc.*,
    878 F.3d 183 (6th Cir. 2017) ........................................ 25, 27, 33, 34

*Idaho Sheet Metal Works, Inc. v. Wirtz*,
    383 U.S. 190 (1966) ...................................................................... 11

*Interprofessionel du Gruyere v. U.S. Dairy Exp. Council*,
    61 F.4th 407 (4th Cir. 2023) ........................................................ 18

*Martin v. Rush, L.L.C.*,
    No. 6:20-CV-00005-JDL, 2021 U.S. Dist. LEXIS 12602
    (E.D. Tex. Jan. 22, 2021) ............................................................ 25

*McGuire v. City of Portland*,
    159 F.3d 460 (9th Cir. 1998) ........................................................ 25

*McQueen v. Chevron Corp.*,
    No. C 16-02089 JSW, 2018 U.S. Dist. LEXIS 57751
    (N.D. Cal. Apr. 3, 2018) .............................................................. 34

*Morrison v. Cty. of Fairfax, VA*,
    826 F.3d 758 (4th Cir. 2016) ........................................................ 18

*Padilla v. Sheldon Rabin, M.D., P.C.*,
    176 F. Supp. 3d 290 (E.D.N.Y. 2016) .......................................... 33

*Riggle v. Revolution Darts & Billiards-Centreville, LLC*,
    No. 1:17-cv-00792, 2018 WL 1568676 (E.D. Va. Mar. 30, 2018) ............ 10-11

*Rodgers v. Basin Sch. Dist. No. 72*,
    2006 U.S. Dist. LEXIS 87716 (D. Idaho Dec. 4, 2006) ................... 25

*Rossignol v. Voorhaar*,
    316 F.3d 516 (4th Cir. 2003) .................................................... 18-19

*Salve Regina College v. Russell*,
    499 U.S. 225 (1991) ................................................................ 14

*Schilling v. Schmidt Baking Co.*,
    876 F.3d 596 (4th Cir. 2017) ................................................. 17

*Seiu, Local 721 v. Cnty. of Riverside*,
    No. 08-1746-JTM, 2011 U.S. Dist. LEXIS 168732
    (C.D. Cal. July 29, 2011) ....................................................... 41

*Smith v. Cent. Sec. Bureau, Inc.*,
    231 F. Supp. 2d 455 (W.D. Va. 2002) .............................. 45-46

*Snead v. EOG Res., Inc.*,
    No. 5:16-CV-1134-OLG, 2018 U.S. Dist. LEXIS 31922
    (W.D. Tex. Feb. 13, 2018) ............................................... 34, 35

*Sonnier v. Recon Mgmt. Servs. Inc.*,
    No. 2:20-CV-00002, 2022 U.S. Dist. LEXIS 8086
    (W.D. La. Jan. 14, 2022) ....................................................... 43

*Thompson v. Potomac Elec. Power Co.*,
    312 F.3d 645 (4th Cir. 2002) ................................................. 16

*U. S. v. 697 Acres of Land in Jasper Cnty.*,
    929 F.2d 695 (4th Cir. 1991) ................................................. 14

*U.S. Search, LLC v. U.S. Search.com, Inc.*,
    300 F.3d 517 (4th Cir. 2002) ................................................. 18

*U. S. ex rel. Berge v. Bd. of Trustees of the Univ. of Alabama.*,
    104 F.3d 1453 (4th Cir. 1997) ............................................... 16

*U.S. ex rel. Reed v. Callahan*,
    884 F.2d 1180 (9th Cir. 1989) ............................................... 14

*United States v. Singer*,
    374 U.S. 174 (1963) ................................................................ 14

*Vaughn v. Wingo Serv. Co.*,
    No. 4:20-CV-3915, 2022 U.S. Dist. LEXIS 142105
    (S.D. Tex. Aug. 4, 2022) ................................................... 43, 45

*Walling v. General. Industries. Co.*,
    330 U.S. 545 (1947) ................................................................ 11

*Webster v. Pub. Sch. Emps. of Washinton., Inc.*,
   247 F.3d 910 (9th Cir. 2001) ............................................................................ 22

**Statutes**

28 U.S.C. § 1291 ............................................................................................. 1

28 U.S.C. § 1294 ............................................................................................. 1

29 U.S.C. § 201 ............................................................................................... 1

29 U.S.C. § 206 ............................................................................................. 22

29 U.S.C. § 207 ................................................................................... 8, 11, 22

29 U.S.C. § 213 ........................................................................... 2, 11, 17, 22

Va. Code Ann. § 40.1-29 ...............................................................................1

Va. Code Ann. § 40.1-29.2 ............................................................................ 1

**Rules**

Fed. R. Civ. P. 56 .................................................................................... 14, 16

**Other Authorities**

29 C.F.R. § 541.100 ...................................................................................... 12

29 C.F.R. § 541.118 .................................................................................. 38, 39

29 C.F.R. § 541.200 ...................................................................................... 12

29 C.F.R. § 541.601 ........................................................................ 8, 11, 12, 27

29 C.F.R. § 541.602 ................................................................................. *passim*

29 C.F.R. § 541.603 ...................................................................................... 46

29 C.F.R. § 541.604 ................................................................................. *passim*

69 Fed. Reg. 22,122 ................................................................................. 41, 42

DOL Opinion Letter FLSA 2018-25, 2018 WL 5921453 .......................................45

Opinion Letter Fair Labor Standards Act (FLSA), 2018 WL 5921453 .................41

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, FLSA
   (July 9, 2003), 2003 WL 23374601 ...................................................................33

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment entered on June 13, 2023, by the United States District Court for the Eastern District of Virginia (the "District Court"), which granted summary judgment in favor of Appellee the City of Alexandria ("Appellee" or "the City").

The District Court had subject matter jurisdiction of this action for unpaid overtime wages pursuant to the Federal Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. §§ 201 *et seq.*, and for earned and accrued unpaid overtime and statutory damages under the Virginia Wage Payment Act ("VWPA"), Virginia Code §§ 40.1-29 *et seq.*, and the Virginia Overtime Wage Act ("VOWA"), Virginia Code §§ 40.1-29.2 *et seq.*

This Court has jurisdiction of this appeal from the final judgment of the district court pursuant to 28 U.S.C. § 1291 and § 1294. Appellants[1] (collectively "Appellants" or "the Chiefs") timely filed their Notice of Appeal to the final order of the District Court on July 12, 2023.

---

[1] Appellants include the following current or former Battalion Chiefs for the City of Alexandria Fire Department: Anthony Kelly, Gregory Cook, Gerald Fair, Jack Hoffman, Christopher Kunkle, David Plunkett, Samuel Reyes, Frederick Ruff, Michael Sharpe, and Chad Lallier.

1

## STATEMENT OF ISSUES

1.    Whether the District Court erred as a matter of law in granting the City's Motion for Summary Judgment where the City failed to prove with clear and convincing evidence that: (i) The Chiefs "plainly and unmistakably" were compensated on a "salary basis;" and (ii) the City was entitled to judgment as a matter of law.

2.    Whether the District Court erred as a matter of law in denying the Chiefs' Motion for Partial Summary Judgment, given voluminous evidence provided by the Chiefs which affirmatively proved there were no genuine issues of material fact as to the City's claimed overtime exemptions and that the Chiefs were entitled to judgment as a matter of law.

## STATEMENT OF THE CASE

The principal dispute in this case is, and remains, whether or not the City properly classified the Chiefs as exempt under the FLSA—specifically, whether or not the Chiefs were compensated on a "salary basis" within the meaning of the FLSA's implementing regulations.

On February 23, 2022, the Chiefs initiated their lawsuit against the City seeking payment of unpaid overtime wages. JA12. The City asserted that the Chiefs were not entitled to overtime wages under the so-called "white-collar" exemptions contained in the FLSA. *See* JA51; 29 U.S.C. §213(a)(1).

2

The Chiefs are current or former Battalion Chiefs ("BCs") employed with the City of Alexandria Fire Department (hereinafter "Fire Department"). JA13–15, JA38. The City employs ten (10) BCs. BCs are assigned to one of two types of shifts: Operational or administrative. JA15, JA38. The Fire Department, including the Fire Chief, the Assistant Chiefs, and the Deputy Chiefs, decide which BC should work in each shift (operational or administrative). JA15, JA38. BCs may rotate between an operational or administrative shift and may be transferred to and from the roles. JA15, JA38.

The Fire Department operates ten (10) fire stations throughout the City and divides the stations into two (2) battalions: East and West Battalion (consisting of five (5) fire stations each). JA15–16, JA38. Each of the East and West Battalions are assigned three (3) BCs on an operational role who rotate working in three (3) shifts and are responsible for the day-to-day operations for the stations within their Battalion. JA16, JA38.

BCs on an operational shift work pursuant to a 28-day "work period," and the City generally schedules BCs in an operational role "on duty" for twenty-four (24) hour shifts. JA16, JA39. BCs on an operational shift are scheduled to work 24 hours on duty, 24 hours off duty, 24 hours on duty, 24 hours off duty, 24 hours on duty, and 96 hours off duty. JA16, JA39. While on duty, BCs on an operational shift are

scheduled for anywhere between forty-eight (48) and sixty-five (65) hours per week. JA16, JA39.

BCs on an administrative shift are not assigned to a specific fire station or geographic area but perform duties for the entire Department. JA17, JA41. BCs on an administrative shift have sometimes been tasked with one of four assignments: Special Operations, Professional Development (or Training), Logistics, and Community Risk Reduction. JA15, JA17–19, JA38, JA41–43.

BCs on an administrative shift do not work in 24-hour shifts or on 28-day work periods but typically work during normal business hours and during 14-day work periods. JA17–19, JA41–43. BCs on an administrative schedule may work overtime depending on staffing and scheduling constraints and availability. JA17–19, JA41–43.

The Chiefs who worked an administrative shift have also worked in an operational shift within the relevant time period, or vice versa (with the exception of Chief Cook, who only worked an operational shift within the relevant time period). JA20, JA44, JA268.

The City assigns each BC a "base pay salary," the amount of which is reflected in the City's pay records. JA993–1009, JA1016.  The City periodically increases these base pay amounts whenever BCs receive a raise. JA44, JA993–1009. Simultaneously with their "base pay salary," the City assigns each BC an "hourly

4

rate," which is reflected in the City's pay records. JA20, JA993–1009, JA1016. BCs' time and hours worked are tracked by the City in its electronic TeleStaff time and attendance system. JA327–328. The City classifies BCs as "salaried" employees exempt from the FLSA and Virginia law's overtime requirements. JA21, JA45.

BCs are compensated pursuant to "an 'hours paid' versus an 'hours worked' policy," as are all non-exempt firefighters. JA1010–1015. In other words, BCs are compensated for their scheduled hours in pre-designated "work periods." JA1010–1015. This policy also stipulates that BCs on an administrative shift are paid overtime pay at the straight time rate after 80 hours paid in a 14-day work period, and BCs on an operational shift are paid overtime pay at the straight time rate after 212 hours paid in a 28-day work period. JA1014.

The City compensates BCs by multiplying their assigned "hourly rate" by the number of hours they are scheduled each work period, including straight-time pay for all overtime hours BCs work (hours worked over 212 each 28-day work period (operational), or hours worked over eighty (80) each 14-day work period (administrative)). JA20–21, JA44–45, JA86–199, JA1010–1015.

Because BCs and non-exempt firefighters on an operational shift are paid pursuant to hours scheduled and worked in a 28-day work period, they do not work consistent hours each bi-weekly pay period. JA335–338, JA359–360, JA1010–1015. To enable these employees to receive a consistent portion of their paid hours in "off"

5

pay periods, rather than pay for a majority of their hours every other pay period (as would happen due to the normal cycle of a 28-day work period), the City unilaterally chooses to issue an advance payment to these employees (including non-exempt firefighters) of a minimum of 106 hours of the hours scheduled in their 28-day work period in each pay period. JA335–338, JA359–360. The City chooses to do this so that these employees (including non-exempt) receive a consistent portion of their paid hours in "off" pay periods, rather than pay for a majority of their hours every other pay period. JA335–338, JA359–360. The City then issues a "true up" payment to these employees at the end of the 28-day work period to account for any hours worked over 212 (overtime) and to "recapture" any "advance of hours" from the 106 hours paid but not worked in the last pay period. JA335–338, JA359–360. All of these payments are based on BCs' hourly rate. JA335–338, JA359–360.

In other words, the City does not compensate BCs the "base pay salary" reflected in the City's pay records; but rather the "hourly rate" listed in those same records. JA86–199, JA993–1009, JA1016–1018.

When the Chiefs' actual wages paid each year are compared to their assigned "base pay salary," the wages paid bear no relation to the Chiefs' assigned "base pay salary," and the Chiefs are often paid under the assigned "base pay salary" amount, as the City's own calculations demonstrate. *Compare* JA993–1009, *with* JA206.

At the end of some, but not all, years, the City reviews scheduled hours of BCs and all firefighters the City classifies as non-exempt (such as Captains and Lieutenants) who worked an operational shift and compares their total scheduled hours for the year to the 2,912 target annual hours used to determine the "base pay salary." JA21, JA45, JA1016–1018. The City then issues a "true up" payment for the difference between the actual scheduled hours for the year and the target 2,912 hours used to calculate the hourly rate from the "base pay salary." JA21, JA45, JA1016–1018. For example, the City issued 2021 salary true-up payments to Chiefs Kunkle, Kelly, Fair, Sharpe, and Hoffman on February 25, 2022. JA1016–1018.

BCs are issued these true-up payments the same as all non-exempt firefighters, such as Captains, Lieutenants, and Firefighters, unlike the Fire Department's Deputy Chiefs and Assistant Chiefs. JA21–22, JA45, JA47, JA352–354, JA1016–1018. Deputy Chiefs and Assistant Chiefs are part of the "executive salary group," are exempt from overtime pay, do not receive additional pay for their overtime hours, and are paid a salary which does not vary from week to week based on scheduled hours or hours worked. JA21–22, JA45, JA47, JA352–354, JA1016–1018. Additionally, Deputy Chiefs and BCs on an administrative shift rotate as the "Duty Chief." JA23, JA47. When serving as the Duty Chief, BCs receive standby pay (for additional hours worked) but Deputy Chiefs do not. JA23, JA47.

7

In its Answer, the City raised affirmative defenses alleging that the Chiefs were exempt from FLSA overtime requirements pursuant to the executive exemption (operational shifts), administrative exemption (administrative shifts), or a combination of the two, and that the Chiefs are "Highly Compensated Employees" within the meaning of 29 C.F.R. § 541.601. JA51. The City also claimed that, to the extent the Chiefs are not exempt from FLSA overtime requirements, they instead qualify for a partial exemption under 29 U.S.C. § 207(k).[2] JA52.

On January 24, 2023, the City filed its Motion for Summary Judgment contending it was entitled to summary judgment on the issue of whether the Chiefs are or were exempt from the FLSA's overtime protections. JA57–85. Then, on February 27, 2023, the Chiefs filed their Motion for Partial Summary Judgment, wherein they argued the City could not meet its burden to prove, by clear and convincing evidence, that the City compensated the Chiefs on a "salary basis." JA963–992.

Before briefing on the Chiefs' Motion was complete, the Supreme Court issued its decision in a case with similar legal issues, *Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 143 S. Ct. 677 (2023) (hereinafter "*Helix IV*"). In their Reply in Support of Their Motion for Partial Summary Judgment, the Chiefs highlighted the significance of this decision, specifically as to the Supreme Court's interpretation

---

[2] Notably, the Chiefs do not contest that the partial exemption under § 207(k) would apply to any week they worked an operational shift, should the Court reverse the District Court's grant of summary judgment to the City.

of the salary basis requirements for the "white collar" exemption regulations to the FLSA. JA1280–1295. In particular, the Reply focused on the Supreme Court's finding that "basis" of payment is synonymous with the unit or method for calculating pay:

> Yet [the City] also readily concedes that [the Chiefs'] earnings are calculated on an hourly basis. *See* [JA1253] (declaring undisputed that [the Chiefs'] earnings are calculated on an hourly basis). As the Supreme Court in [*Helix IV*] has now declared, no matter which part of the regulations you look at, that can never satisfy the salary basis requirement unless at least some part of the employee's earnings is guaranteed to be calculated on a salary (i.e. weekly) basis. To wit:

> [A] "basis" of payment typically refers to the unit or method for calculating pay, not the frequency of its distribution. Most simply put, an employee paid on an hourly basis is paid by the hour, an employee paid on a daily basis is paid by the day, and an employee paid on a weekly basis is paid by the week—irrespective of when or how often his employer actually doles out the money. The inclusion of the word "receives" in §602(a) does not change that usual meaning. . . . an employee receives compensation on a weekly—as opposed to a daily or hourly—basis, as §602(a) demands, when he gets paid a weekly rate. The provision's temporal dividing line is not about paycheck frequency.

JA1282 (citing *Helix IV*, 143 S. Ct. at 687). The Court thereafter held a hearing on the cross motions and ordered supplemental briefing to address *Helix IV*. JA1401–1402.

Ultimately, the District Court granted the City's Motion for Summary Judgment and denied the Chiefs' Cross-Motion for Partial Summary Judgment. JA1464–1480. The District Court issued a Memorandum Opinion which made the

9

following material findings: (i) the Chiefs worked overtime hours and were hourly-rate employees; (ii) the Chiefs' compensation scheme did not satisfy 29 C.F.R. § 541.602(a)'s (hereinafter "602(a)") default salary basis test, but did satisfy the alternative test contained in 29 C.F.R. § 541.604(b) (hereinafter "604(b)"); (iii) the Chiefs received weekly guarantees of a sufficient amount under 604(b); and (iv) there was a "reasonable relationship between these guarantees and actual earnings in a normal scheduled workweek." JA1464–1480.

## SUMMARY OF ARGUMENT

This appeal asks this Court to answer a fundamental question: What constitutes a salary "guarantee" within the meaning of 29 CFR § 541.604(b)? The answer to this question is critical to ascertain whether the Chiefs were compensated on a salary basis within the meaning of 604(b) and thus whether the District Court was correct in holding that the Chiefs qualify as exempt from the overtime protections of the FLSA. This is also an issue of first impression in the Fourth Circuit. Respectfully, the Chiefs submit that the District Court wrongly decided this issue, as the Chiefs are and were not compensated on a salary basis.

The District Court's decisions as to its grant of summary judgment to the City and the applicable legal standards are reviewed *de novo* and provided no deference. "The FLSA requires that employees be paid time and a half for hours worked in excess of forty in a single week." *Riggle v. Revolution Darts & Billiards-Centreville,*

*LLC*, 2018 WL 1568676, at *2 (E.D. Va. Mar. 30, 2018) (citing 29 U.S.C. § 207(a)(1)). Section 13(a)(1) of the FLSA provides an exemption from the overtime pay requirements under the statute for persons "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The application of an exemption under the FLSA is an affirmative defense on which the employer, the City in this case, has the burden of proof by clear and convincing evidence. *Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282, 286 (4th Cir. 1986) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974)); *see also Idaho Sheet Metal Works v. Wirtz*, 383 U.S. 190, 206 (1966) (defendant employer has "the burden of establishing facts requisite to an exemption"); *Walling v. General Industries Co.*, 330 U.S. 545, 548–49 (1947) (defendant employer has "the burden of proving the existence of [the] conditions" of the exemption).

Of the three categories of exempt employees—administrative, executive and professional—the City claims the Chiefs fall within either the executive or administrative exemption, depending on which shift they worked (operations or administrative). The City also claims the Chiefs are "Highly Compensated Employees" ("HCE") within the meaning of 29 CFR § 541.601. To be highly compensated, an employee's compensation must have exceeded $100,000 (prior to January 1, 2020) and $107,432 (on or after January 1, 2020). 29 C.F.R. § 541.601(a)(1). To meet any of these exemptions, the City was required to prove that

11

the Chiefs were paid on a "salary basis." *See* 29 C.F.R. § 541.100(a)(1) (executive);

29 C.F.R. § 541.200(a)(1) (administrative); 29 C.F.R. § 541.601(b)(1) (HCE Test).

In its Motion for Summary Judgment, the City argued that the Chiefs were exempt from overtime protections even though it was not in dispute that the pay for the Chiefs is or was predicated on hours scheduled in each work period, not a fixed salary, and that each is or was paid by the hour. This was not an accident. The City designed the Chiefs' compensation scheme this way in a deliberate effort to compensate the Chiefs for their scheduled hours and overtime hours worked.

The District Court erroneously found that the Chiefs' compensation scheme satisfied the alternative salary basis test outlined in 604(b). Section 604(b) provides:

> An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned.

The District Court's conclusion is erroneous for two primary reasons.

First, the record does not support the District Court's findings. The City's alleged salary "guarantees" amount to nothing more than an illusion. As the City's own policies state: the Chiefs and all non-exempt firefighters are paid pursuant to "an 'hours paid' versus an 'hours worked' policy." Additionally, the City's alleged salary "guarantees" are not contained in its "employment arrangement" with the

Chiefs, as they are not found in any City policies, pay plans, class specifications, or even within the Chiefs' personnel files and pay records.

Second, the law does not support the District Court's finding. Even assuming *arguendo* that the City's "guarantees" do, in fact, exist, they were paid on an hourly, not a salary basis. Further, they were paid *with* regard, not regardless of, the number of hours and shifts worked by the Chiefs. Finally, the Chiefs' actual earnings bore no reasonable relationship with the City's purported "guarantee." The Chiefs' "usual earnings"—based on the hours actually worked and earnings paid—dwarfed their alleged salary "guarantee."

As outlined and supported herein, each one of the District Court's rulings on the issues and arguments presented is legally and factually deficient and should be rejected by the Court. Consistently, the District Court resolved conflicting presentations of evidence in the light most favorable to the City, the moving party on the granted motion. As the City failed to meet its burden establishing its claimed exemptions by clear and convincing evidence, and its entitlement to summary judgment as a matter of law, the Chiefs request this Court reverse the District Court's grant of summary judgment to the City, grant the Chiefs' Partial Motion for Summary Judgment, and remand for further proceedings.

## <u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where there is "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable fact-finder to return a verdict for either party. *Id.* at 252. The non-moving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp.*, 477 U.S. at 324. The nonmovant's evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 249. The Court will not weigh the evidence or make findings of fact. *Id.*

Similarly, this Court has clearly established that "[a] determination of whether the district court applied the proper standard is a question of law, . . . permitting this Court to review [a] case *de novo*." *U.S. v. .697 Acres of Land in Jasper County*, 929 F.2d 695 (4th Cir. 1991) (citing *United States v. Singer*, 374 U.S. 174, 192–93 (1963) & *United States ex rel. Reed v. Callahan*, 884 F.2d 1180 (9th Cir. 1989)). The Supreme Court has further held: "When *de novo* review is compelled, no form of appellate deference is acceptable. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991).

Hence, this Court must make independent determinations regarding both the propriety of summary judgment and the applicable standards for the exemption determination, including salary basis, under the FLSA.

## ARGUMENT

I. **THE DISTRICT COURT'S FINDING THAT THE CHIEFS WERE COMPENSATED ON A SALARY BASIS, AND THUS EXEMPT FROM THE FLSA'S OVERTIME PROTECTIONS, SHOULD BE REVERSED.**

The primary issue presented is whether the District Court was correct in granting summary judgment in favor of the City and denying it to the Chiefs. This requires the Court to analyze two elements: (1) Whether there were genuine issues of material fact precluding summary judgment to either party; and (2) whether the Chiefs, and not the City, were entitled to judgment as a matter of law. Indeed, the Chiefs submit that they, not the City, were entitled to summary judgment on liability based on the applicable standards that were not properly applied by the District Court.

**A. The City Failed to Satisfy its Considerable Legal Burden of Proof While the District Court Failed to Properly Apply Those Standards to the Virtual Mountain of Contrary Facts and Evidence Presented by the Chiefs.**

A quintessential determination to be made in this appeal is whether the District Court correctly applied the appropriate legal standards to the parties' evidence in finding there were no genuine issues of material fact in granting summary judgment to the City. The record reveals that the District Court initially recognized most of the

appropriate standards to be applied but failed to properly apply them. Hence, it reached the incorrect conclusion that the City, and not the Chiefs, was entitled to summary judgment.

        a.  <u>The District Court initially recognized, but then failed to properly apply, the City's general burden of proof.</u>

The District Court recognized the following relevant legal standards that were to be applied below and should be applied by this Court:

> Summary judgment is appropriate when "*there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.*" Fed. R. Civ. P. 56(a). Summary judgment will be granted unless "*a reasonable jury could return a verdict for the nonmoving party" on the evidence presented. See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An otherwise properly supported summary judgment motion will not be defeated by the existence of a dispute as to immaterial facts; only disputes over facts that might affect the outcome of the trial will properly preclude the entry of summary judgment. *Id.* at 248. The claimant bears the initial burden of proof as to each and every element of his claims. *See United States ex rel. Berge v. Bd . of Trustees of the Univ. of Alabama*, 104 F.3d 1453, 1462 (4th Cir. 1997). "*Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case.*" *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (internal citation omitted) (internal quotation marks omitted); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014).
>
> The City has argued various exemptions apply that prevent the Plaintiffs from recovering under the FLSA. . . . *A defendant employer carries the burden of proving an exemption applies, which is an affirmative defense under the FLSA. Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282, 286 (4th Cir. 1986).

JA1468–1470 (italics added). Unfortunately, however, the District Court failed to properly apply these standards to the evidence presented.

16

     b. <u>The District Court did not correctly recognize or apply the City's burden to prove that the Chiefs "plainly and unmistakably" fell within an overtime exemption under the FLSA by "clear and convincing" evidence.</u>

The District Court failed to recognize the City's correct burden of proof. "[I]t is well established in our circuit that when an employer defends an FLSA action on the ground that its employee falls within a § 213 exemption, it bears the burden of proof on that question . . . and must carry that burden under the 'clear and convincing evidence' standard." *Carrera v. E.M.D. Sales Inc.*, 75 F.4th 345, 351–52 (4th Cir. 2023), *petition for cert. pending*, No. 23-217 (internal citations omitted).

While exemptions under the FLSA are to be given a "fair" interpretation,[3] "the purpose of the FLSA is remedial in nature. . . . Consistent with that purpose, [this Court] construe[s] the FLSA liberally, recognizing that broad coverage is essential to accomplish the statute's goals." *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *Schilling v. Schmidt Baking Co.*, 876 F.3d 596, 602 (4th Cir. 2017) (internal quotation marks and citations omitted). Thus, "FLSA

---

[3] While the Supreme Court in *Encino Motorcars* rejected a "narrow" interpretation of exemptions under the FLSA, it did not abrogate the long-standing dictate that employees must "plainly and unmistakably" fall within the purported exemption. Further, "nothing in the *Encino* decision relates to evidentiary burdens[.]" *Carrera*, 75 F.4th at 350, 353 ("[I]t is entirely possible for us to read our precedent 'harmoniously' with *Encino Motorcars* . . . giving a fair, not narrow, legal construction to the FLSA's exemptions . . . while also requiring employers to prove the facts that would put their employees within those exemptions by clear and convincing evidence." (internal citations omitted)).

exemptions, including this one, are to be . . . applied only in instances 'plainly and unmistakably within the exemptions' terms and spirit.'" *Morrison v. Cty. of Fairfax, VA*, 826 F.3d 758, 761 (4th Cir. 2016) (citing *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 692 (4th Cir. 2009).

The District Court failed to correctly apply these standards.[4]

> c.  <u>The District Court failed to correctly apply the applicable legal standards and ignored contrary facts presented by the Chiefs.</u>

The District Court engaged in an approximately six-page discussion of the exemptions' salary basis requirement without once applying any of the applicable standards that were to guide it in addressing the disputed factual issues. JA1470–1475. Indeed, the District Court's analysis reveals that it ignored key evidence presented by the Chiefs, weighed the evidence it chose to acknowledge, and viewed that evidence in a light most favorable to the City, which it was not permitted to do when granting summary judgment to the City. *See, e.g.*, *Interprofessionel du Gruyere v. U.S. Dairy Exp. Council*, 61 F.4th 407, 415 (4th Cir. 2023) ("In evaluating a motion for summary judgment, the court views the record in the light most favorable to the nonmoving party." (citing *U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 522 (4th Cir. 2002))); *see also Rossignol v.*

---

[4] The District Court did mention that the City bears the burden of proving the exemptions, but it did not mention the "plainly and unmistakably" or "clear and convincing" burdens that comes with it, whether or not the exemptions are to be fairly construed. JA1470.

*Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) ("When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." (internal quotation marks omitted)).

In finding that the City met its burden to establish that the Chiefs were paid on a salary basis pursuant to 604(b), the District Court almost categorically failed to reference the plethora of evidence presented by the Chiefs which directly contradicted this finding. JA1470–1475. The Court then proceeded to essentially dismiss that evidence in adopting wholesale the City's *interpretation* of their competing evidence. JA1470–1475 But the District Court provided no explanation as to why it weighed this competing evidence, failed to view it in a light most favorable to the Chiefs, or how it could have been viewed as a mere scintilla of evidence, as the applicable standards required, in order to disregard the Chief's evidence. JA1470–1475

Indeed, the District Court failed to view any evidence in a light most favorable to the Chiefs, and actually viewed and distinguished the Chief's evidence in a light most favorable to the City. JA1471–1473. This includes the Court's view of, or failure to even discuss, the following: (i) the City's failure to inform the Chiefs that they allegedly receive a minimum guarantee; (ii) the absence of the alleged guarantees in any of the City's policies and pay documentation applicable to the Chiefs; (iii) the changes and fluctuations of the alleged guarantees depending on

19

whether an operational or administrative shift was worked; (iv) City policy which states the Chiefs were paid pursuant to "an 'hours paid' versus an 'hours worked' policy;" (v) the references to a "base pay salary" for the Chiefs in City Information Bulletins which bear no relation to the City's alleged guarantees; (vi) the alleged guarantees being paid on an hourly, not salary, basis; and (vii) the City's characterization of the alleged guarantees as advances in pay, the hours of which were subject to being "recaptured" the following pay period. *See, e.g.*, JA1162–1171; JA1471–1473.

Indeed, the District Court ignored the vast majority of the above-referenced evidence, providing not even a footnote acknowledgment. To support its holding that the City met its burden in establishing salary basis guarantees under 604(b), the District Court stated:

> Payroll records indicate that apart from their compensation for overtime hours, [the Chiefs] were guaranteed 106 hours worth of pay every two weeks as operational [Chiefs] and 80 hours worth of pay every two weeks as administrative [Chiefs]. Under the various hourly rates for operational [Chiefs] and administrative [Chiefs] from 2019 to 2022, it is undisputed that both 106 and 80 hours worth of pay here easily exceeded the $684 weekly minimum for salary basis under§ 604(b). [The Chiefs] argue these guarantees were in fact being provided on an hourly, not a weekly basis, given that they were computed by multiplying 106 hours and 80 hours by hourly rates . However, these calculations were not an actual function of the hours worked by [the Chiefs]. So even if the guaranteed portions of [the Chiefs'] earnings had to be provided on a salary basis under § 602(a)'s standard, their guarantees would still be compliant because they were provided without regard to hours worked. This is illustrated by the fact that

20

operational [Chiefs] were still paid at least 106 hours worth of pay even
when they worked fewer than 106 hours in a two-week work period.

JA1472–1473.

But in so holding, the Court impermissibly failed to consider contrary
evidence presented by the Chiefs, including evidence which affirmatively
demonstrated that the alleged guarantees were subject to change depending on which
shift (operational or administrative) was worked, as well as the guarantees being
subject to being "recaptured" if the Chiefs did not work the allotment of hours for
the guarantees in the pay period at issue—both of which violate the express language
of 604(b). JA1162–1171. The Court thus impermissibly viewed the evidence in a
light most favorable to the City. JA1471–1473.

In the end, the District Court's analysis of the evidence before it failed to (i)
view the totality of evidence in a light most favorable to the Chiefs, (ii) draw all
reasonable inferences in favor of the Chiefs, (iii) find that no reasonable factfinder
could agree with the Chief's view of the evidence, (iv) find that the Chiefs merely
submitted a scintilla of evidence to support their positions, or (v) find that the City
"plainly and unmistakably" and with "clear and convincing" evidence proved that
there are no triable issues of material fact under the salary basis test, including as to
the disputed issue of whether the Chiefs are hourly or salaried employees.[5] At

---

[5] Indeed, none of the critical buzzwords in the standards, like "plainly and
unmistakably," "clear and convincing," "drawing all reasonable inferences for the

bottom, the City grossly failed to meet its substantial burden of proof. The Judgment

should thus be reversed.

**B. The District Court Erred in Granting Summary Judgment to the City Because the Chiefs, Not the City, Were Entitled to Judgment as a Matter of Law.**

   a. The City failed to produce "clear and convincing" evidence that the FLSA overtime exemptions apply because the Chiefs are not "plainly and unmistakably" paid on a "salary basis."

The FLSA and regulations implementing its overtime exemptions have long

required that, for an employee to be exempt from overtime as a "bona fide executive,

administrative, or professional capacity," the employee: (1) must be paid on a salary

basis ("salary basis test"); (2) must receive at least a minimum specified salary

amount ("salary level test"); and (3) must work in a job that primarily involves

executive, administrative, or professional duties as defined by the regulations

("duties test"). *See generally* 29 U.S.C. §§ 206(a)(1)(C), 207(a)(1), 213(a)(1).

The FLSA "grants the Secretary of Labor ["Secretary"] broad authority to

promulgate regulations to 'define and delimit' the scope of the exemption." *Webster*

*v. Pub. Sch. Emps. of Washington, Inc.*, 247 F.3d 910, 914 (9th Cir. 2001) (quoting

29 U.S.C. § 213(a)(1)). The Secretary has promulgated a regulation, codified in 29

C.F.R. § 541.602, that governs the application of the salary basis test. According to

---

non-moving party," viewing the evidence in a "light most favorable to the
nonmoving party," were even mentioned in the decision. JA1464–1479.

this regulation, an employee is paid on a "salary basis" when (and only if): (i) "the employee regularly receives each pay period *on a weekly, or less frequent basis*," (ii) "a *predetermined amount* constituting all or part of the employee's compensation," and (iii) the amount "is not subject to reduction *because of variations in the quality or quantity of the work performed*." 29 C.F.R. § 541.602(a) (italics added). The Secretary has further determined that, to qualify under the salary basis test, "an exempt employee must receive the full salary for any week in which the employee performs any work *without regard to the number of days or hours worked*." *Id.* (italics added).

Indeed, the Supreme Court in *Helix IV* has clarified that for an employee to be considered paid on a "salary basis," at least some part of their pay must be calculated on a salary (i.e. weekly or less frequent) basis. In other words, the Court's inquiry must analyze the unit or method for calculating the employee's pay:

> [A] "basis" of payment typically refers to **the unit or method for calculating pay**, not the frequency of its distribution. Most simply put, an employee paid on an hourly basis is paid by the hour, an employee paid on a daily basis is paid by the day, and an employee paid on a weekly basis is paid by the week—irrespective of when or how often his employer actually doles out the money. The inclusion of the word "receives" in §602(a) does not change that usual meaning. . . . an employee receives compensation on a weekly—as opposed to a daily or hourly—basis, as §602(a) demands, when he gets paid a weekly rate. The provision's temporal dividing line is not about paycheck frequency.

> Our reading of §602(a) also tracks how neighboring regulations use the term "basis" of payment. **Over and over in the Secretary's rules, that term means the unit or method used to calculate earnings**. . . . And consistent with that usage, §602(a)'s demand that a salaried worker get a preset, fixed amount "on a weekly[] or less frequent basis" **means that his paycheck reflects how many weeks—not days or hours—he has worked.**

*Helix IV*, 143 S. Ct. at 687 (emphasis added). Thus, the Supreme Court settled what was obvious from the explicit text of the regulations: That the "salary basis" definition contained in 602(a) requires an employee's earnings to be calculated using a weekly or less frequent *unit of time* (i.e., not hourly).

Nevertheless, if an employee's regular earnings are calculated on an hourly basis, the governing regulations provide an alternative salary basis test under 604(b), which requires an "employment arrangement" with a "minimum guarantee." 29 C.F.R. § 541.604(b). Thus, the City is allowed to calculate an exempt employee's regular earnings "on an hourly, a daily or a shift basis" *only so long as*: (1) the "employment arrangement *also* includes a guarantee of at least the minimum weekly required amount *paid on a salary basis regardless of the number of hours, days, or shifts worked*;" and (2) "a reasonable relationship exists" between the guarantee and the employees' *actual earnings*. *Id.* (italics added).

As will be shown, the City failed to prove, with clear and convincing evidence, that it plainly and unmistakably meets these regulatory requirements to establish its alleged salary basis exception to the FLSA. The City was, therefore, not entitled to summary judgment.

24

b. <u>The City failed to prove that there plainly and unmistakably exists an "employment arrangement" with the Chiefs that includes a salary "guarantee."</u>

The District Court erred by finding that there was, as a matter of law, minimum salary guarantees that were included as part of the "employment arrangement" between the Chiefs and the City under 604(b).

The "minimum guarantee" must be an obligation that binds the employer. Indeed, "[t]he operative idea behind a guarantee, in other words, is in this context that the employer is . . . obligated not to change its mind and reduce whatever amount it previously determined to provide." *Hughes v. Gulf Interstate Field Servs., Inc.*, 878 F.3d 183, 192 (6th Cir. 2017) (italics added). The focus of the Court's review, therefore, is on how concrete the guarantee is to protect the rights of employees. *Id.* The District Court failed to do so.

As a matter of law, there is no "guarantee" of pay where it is not present in the employment agreements underlying the employment arrangement. *See, e.g.*, *Rodgers v. Basin Sch. Dist. No. 72*, 2006 U.S. Dist. LEXIS 87716, at *9–*13 (D. Idaho Dec. 4, 2006) (citing *McGuire v. City of Portland*, 159 F.3d 460, 461–61 (9th Cir. 1998)); *Martin v. Rush, LLC*, No. 6:20-CV-00005-JDL, 2021 U.S. Dist. LEXIS 12602, at *18–*19 (E.D. Tex. Jan. 22, 2021) (minimum guarantee requirement was not met even where a project proposal to a client included a generic hourly guarantee for all employees because there was nothing in any of the communications to the

25

employee, including his offer letter, stating that there was a minimum guarantee of pay). Nor did the City produce any such employment agreements.

Moreover, the District Court ignored key evidence presented by the Chiefs establishing an employment arrangement that did not include any "guarantee." For example, the Chiefs presented the District Court with evidence establishing that, from the outset of their employment, all firefighters up to the rank of Battalion Chief (including non-exempt employees) are assigned an annual "base pay salary" and an hourly rate that is derived from that "base pay." JA332–334, JA993–1009, JA1016–1018. The City defines the Chiefs' hourly rate as their "salary divided by either the operational shift or their administrative shift." JA332. For Chiefs who work an operational shift, the City divides their annual salary by 2,912 hours (average annual hours for an operational shift, or 112 hours per biweekly pay period) to determine their hourly rate. JA333. For Chiefs who work an administrative shift, the City divides their annual salary by 2,080 hours (average annual hours for an administrative shift, or 80 hours per biweekly pay period). JA333.

The Chiefs further presented the District Court with a sampling of "Personnel Action Forms" ("PAF"), which governed compensation changes during the Chiefs' employment. JA993–1009. For example, on one PAF dated January 26, 2019, the City agreed to pay Chief Kelly a purported annual salary of $126,991.54, to be paid on an hourly basis of $43.60 per hour for his operational shift ($126,991.54 / 2,912

26

hours for operational shift = $43.60 per hour). JA1005. Through this PAF, the City promised and represented to Chief Kelly that he would receive a _**base pay salary**_ of $126,991.54, effective January 26, 2019. JA1005, JA1016. Chief Kelly also received overtime compensation at his straight time hourly rate ($43.60 at that time). JA112–115.

Significantly, Chief Kelly never received this promised "base pay salary" of $126,991.54, as even the City's purported "salary" calculations show. JA200, JA1005. Indeed, the City's calculations (which, to be clear, simply add together hourly compensation the Chiefs received under _ten separate pay codes_ and excludes overtime pay codes, "even when paid for regularly-scheduled operational hours") show that Chief Kelly received an alleged $120,088 salary in 2019. JA200. This is $6,903.54 less than Chief Kelly's promised annual "base pay salary" for the same period. JA200, JA1005.

Indeed, other than the Chiefs' purported "base pay salary," there is no "guarantee" paid on a salary basis, regardless of hours or shifts worked, which is contained in _any_ City policy, memorandum, or other document or agreement applicable to the Chiefs, nor did the City produce any. _See, e.g._, _Hughes v. Gulf Interstate Field Servs., Inc._, 878 F.3d at 191–92 ("If [the employees] are to qualify as exempt under § 541.601, in short, it matters whether their minimum weekly salary

27

was in fact guaranteed, or whether it was simply something that [the employer] had not so far availed itself of its right to reduce.").

The District Court thus failed to find, because the City failed to prove, that the Chiefs' "employment arrangement" plainly and unmistakably contains a predetermined "guarantee." *See* 29 CFR § 541.604(b). Indeed, the Court's sole piece of evidence it used to ground its finding that the Chiefs "received weekly guarantees of a sufficient amount" was the "[p]ayroll records" produced by the City. JA1472. But nowhere within these records are any "guarantees" indicated. JA86–199. Instead, the records simply list multiple *hourly* pay codes, the Chiefs' applicable *hourly* rates, the number of *hours* worked and/or paid at each rate, and any leaves taken, because that is *in fact* how the Chiefs were paid. JA86–199.

Accordingly, the City failed to meet its burden to prove that there is, plainly and unmistakably, an employment arrangement between the Chiefs and the City under which the City is obligated to pay and the Chiefs are, *in fact*, guaranteed to receive a predetermined minimum amount of compensation, paid on a salary basis, regardless of the number of hours, days, or shifts worked. Therefore, the Chiefs, and not the City, should have been granted summary judgment, as a matter of law.

    c.  <u>The City failed to prove that the Chiefs plainly and unmistakably received "minimum guarantees" that were "paid on a salary basis."</u>

Additionally, the District Court erred by concluding that the City's alleged guarantees were "paid on a salary basis" within the meaning of 604(b). JA1472–1473.

Hourly rate workers, "of whatever income level, are paid on a salary basis only through the test set out in §604(b)." *Helix IV*, 143 S. Ct. at 685. Section 604(b) provides:

> An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a **<u>guarantee</u>** of at least the minimum weekly required amount **<u>paid on a salary basis</u>**[.]

(emphasis added). Consistent with the explicit text of the regulation, to qualify as a "guarantee" within the meaning of 604(b), the guarantee must be "at least the minimum weekly required amount" (currently $684 per week) and be "paid on a salary basis." *Id.* As *Helix IV* demonstrates, "salary basis" means a guarantee under 604(b) must be *calculated* using a weekly or less frequent *unit of time*, **not** calculated using an hourly unit. *Helix IV*, 143 S. Ct. at 687 ("the 'basis' in that phrase is the unit of time used to calculate pay, and that unit must be a week or less frequent measure; it cannot be a day, or other more frequent measure[.]").

Indeed, *Helix IV* requires this conclusion: "[Section] 604(b) refers to earnings computed 'on an hourly, a daily or a shift basis' **as distinct from** 'amount[s] paid on a salary basis regardless of the number of hours, days or shifts worked.'" *Id.* at 688 (emphasis added); *see id.* at 689 ("An employee's earnings, §604(b) provides, 'may be computed on' [an hourly basis] without 'violating the salary basis requirement' so long as an employer '**_also_**' provides a guarantee of **weekly payment** approximating what the employee usually earns." (emphasis added)); *see also id.* at 691 ("[The employer] could come into compliance with the salary-basis requirement for [the employee] and similar employees in either of two ways. It could **_add_** to [the employee's] per-day rate a **weekly** guarantee that satisfies §604(b)'s conditions. Or it could convert [the employee's] compensation to a straight weekly salary for time he spends on the rig." (emphasis added)).

Even if the City's alleged guarantees exist (a contention that the Chiefs vehemently dispute), the City readily admits that the guarantees were paid on an *hourly* basis, not a weekly or less frequent basis. JA1259 ("The City's guarantees of 106 operational or 80 administrative **_hours' pay_** applied even where scheduled hours went unworked, because the difference was paid as paid leave."). Indeed, in its briefing in the Court below, the City cited to pay records which clearly show the Chiefs' pay being calculated on an hourly basis. JA86–199.

30

Moreover, the employer in *Helix IV* presented arguments very similar to the City's here. There, the employer attempted to argue to that the employee's day rate, which was above the regulations' minimum $455 per week salary threshold, itself satisfied the salary basis test, as if the employee worked even one day per week, he would be "guaranteed" at least his day rate (which was above the minimum salary level). *See Helix IV*, 143 S. Ct. at 688, n.5. In casting aside these arguments, the Supreme Court noted:

> [The employee's] high daily pay ensured that the HCE rule's *salary-level* requirement would not have prevented his exemption: $963 (per day) is indeed more than $455 (per week). But before any discussion of salary level comes in, an employer must pay an employee on a *salary basis*. . . . And [the employee] was not. He received a high day rate (higher than lots of salaries); but he did not get a salary (of $963 or any other amount) because his weekly take-home pay could be as little as $963 or as much as $13,482, depending on how many days he worked.

*Id.*

The City's arguments in the Court below are even less convincing. Instead of relying on a high hourly rate, the City instead presented its calculations of an amalgamation of *ten* distinct hourly pay codes for the Chiefs in an attempt to manufacture some semblance of a guarantee to meet the requirements of 604(b). *See* JA200–205, JA1257–1259. While this theory might meet the *salary level* requirement, it certainly does not meet the *salary basis* requirement, as even the City readily admits these pay codes (which it inexplicably claimed together amount to a

31

single "guarantee") were paid on an *hourly* basis, not a weekly or less frequent basis. *See* JA1257 ("The City's guarantees of 106 operational or 80 administrative **hours' pay** applied even where scheduled hours went unworked, because the difference was paid as paid leave."). Indeed, the City cites to pay records which clearly show the Chiefs' pay being calculated on an hourly basis. JA86–199.

Thus, the City failed to prove that this pay scheme complies with the strict requirements of 604(b). While an exempt employee's earnings may be paid on an hourly basis, 604(b) demands that the employee also be promised, as part of the "employment arrangement," a guarantee, ***paid on a salary basis***, which "is distinct from" their hourly pay. *See Helix IV*, 143 S. Ct. at 688. The City did not meet this strict requirement, by its own admission. Thus, the District Court's grant of summary judgment should be reversed, and summary judgment should be entered in favor of the Chiefs.

    d.  The City failed to prove that the Chiefs plainly and unmistakably received a "real" structural "minimum guarantee."

The District Court also failed to find that the City proved a real, structural minimum guarantee, paid on a salary basis, that binds the City to always pay the Chiefs regardless of hours or shifts worked in a pay period. Consequently, the City failed to meet its burden to prove that it properly pays the Chiefs on a salary basis.

Indeed, the mere fact that an employee always receives more than the statutory minimum salary is insufficient to satisfy the "minimum guarantee" requirement under 29 C.F.R. § 541.604(b).

In *Padilla v. Sheldon Rabin, M.D., P.C.*, 176 F.Supp.3d 290 (E.D.N.Y. 2016), the court held that the defendant failed to establish that the plaintiff was guaranteed a minimum guarantee of $455 per week and made clear that "although the evidence shows that the plaintiff did receive more than $455 per week during the time he worked for the [employer], there is no evidence that plaintiff was guaranteed that amount." *Id.* at 302–03.

Similarly, in *Hughes*, the court described this distinction between receipt of payment and a guarantee of payment as one of "matter of grace" versus "[matter of] right." 878 F.3d at 191–92 (citing U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, FLSA (July 9, 2003), 2003 WL 23374601, at *2 ("If a pay system compensates employees who are claimed to be exempt on the basis of hourly wage rates computed from their actual hours worked each week, it is necessary to determine whether a salary guarantee is in effect and operational. Payment on an hourly basis *without an operative salary guarantee* does not qualify as a 'salary basis' of payment within the meaning of the regulations.")) (emphasis added).

The *Hughes* court also found that the plaintiffs "introduced evidence to suggest that their pay was not calculated hourly, but daily." *Hughes*, at 191–92. If

33

the plaintiffs there were to qualify as exempt, the court held that "it matters whether their minimum weekly salary was in fact guaranteed, or whether it was simply something that [the employer] had not so far availed itself of its right to reduce." *Id.* "'**It is not enough under the salary-basis test for an employer to show only that the employee received the same amount of pay each week, as doing so would negate the remainder of the test.**" *Id.* (emphasis added) (citing *Duffie v. The Michigan Grp., Inc.*, No. 14-CV-14148, 2016 WL 28987, at *4 (E.D. Mich. Jan. 4, 2016)).

The *Hughes* court, therefore, held that evidence the plaintiffs always received more than a set amount was insufficient to establish that they were paid on a salary basis. *Id.*; *see also McQueen v. Chevron Corp.*, No. C 16-02089 JSW, 2018 U.S. Dist. LEXIS 57751, at *4 (N.D. Cal. Apr. 3, 2018) (evidence that employer consistently paid above a minimum insufficient because "evidence that plaintiff regularly received a qualifying amount of pay is not the same as evidence that he was guaranteed to receive that amount regardless of the quality or quantity of work he performed."); *Snead v. EOG Res., Inc.*, No. 5:16-CV-1134-OLG, 2018 U.S. Dist. LEXIS 31922, at *11 (W.D. Tex. Feb. 13, 2018) (evidence that employee "always did receive bi-weekly pay in excess of $910" was "unsurprising" given amount of work imposed on employee and did not establish that the employee was guaranteed to receive that amount regardless of the quantity of work performed).

Here, the District Court grounded its finding that the Chiefs "received weekly guarantees of a sufficient amount" exclusively from "[p]ayroll records" which, the City argued, reflected the purported guarantees, despite these records only reflecting *hourly* pay on multiple *hourly* pay codes. JA86–199, JA1472–1473. Indeed, the District Court adopted the City's selective and self-serving analysis of this pay data to find that the alleged guarantees exist, despite the City "exclud[ing] pay codes 240 'FLS REG TIME' and 201 'OVERTIME AT THE STRAIGHT RATE' *even when paid for regularly-scheduled operational hours*. JA200 (emphasis added). Of course, when excluding these overtime pay codes, it is "unsurprising" that the sum of the remaining ten pay codes is often consistent, given that the Chiefs worked overtime in nearly every workweek. *See* JA86–199; *Snead*, 2018 U.S. Dist. LEXIS 31922, at *11. But this evidence is insufficient to show that these selective sums are guaranteed by a mutual agreement, nor did the District Court make such a finding.

Thus, the City failed to prove as a matter of law that the Chiefs plainly and unmistakably receive a "minimum guarantee" that is a "real" structural guaranteed minimum salary. Accordingly, the District Court's decision should be reversed.

e. <u>The City failed to prove that the Chiefs are plainly and unmistakably paid a minimum salary "regardless of hours, days or shifts worked."</u>

In addition to failing to prove the guarantees are not an illusion, the City failed to prove that it pays the Chiefs guarantees "regardless of the number of hours, days or shifts worked." 29 C.F.R. § 541.604(b). Nor did the District Court make such a

finding. This is because the City pays the Chiefs at hourly rates based on the number of hours they are scheduled and work each work period. JA86–199, JA1010–1018.

Indeed, here, the purported guarantees were subject to change depending on the number of hours or shifts worked—specifically, as the City itself conceded, Chiefs who worked an operational shift were supposed to receive a "guarantee" of 106 hours of pay every bi-weekly pay period, while those who worked an administrative shift would receive 80 hours of pay. *See* JA74 ("Salary amounts were slightly less for BCs paid on operational rates only because their guarantee was 106 hours rather than 112."). The Chiefs regularly changed between operational and administrative shifts. JA268. Further, the City admitted to a "truing up" any guarantees at the end of a 28-day work period for operational shifts to account for any hours worked over 212 (overtime) and to "***recapture***" any "***advance of hours***" from the 106 hours "guarantee" paid but not worked in the previous pay period. JA209.

Before it reached the Supreme Court, the Fifth Circuit, sitting *en banc*, performed a similar analysis under 604(b) in *Hewitt v. Helix Energy Sols. Grp.*, 15 F.4th 289 (5th Cir. 2021) (hereinafter "*Helix III*"). There, the Fifth Circuit found that the employees were not paid on a salary basis where the employer "pays [the employee] a daily rate without offering a minimum weekly required amount paid 'regardless of the number of hours, days or shifts worked.' 29 C.F.R. § 541.604(b).

[The employer] theorizes that [the employee's] daily rate is the minimum weekly guaranteed amount. But a daily rate, by definition, is paid with regard to—and not 'regardless of'—'the number of . . . days . . . worked.'" *Id.* at 294. In line with *Helix III*, the City has admitted that the Chiefs' purported guarantee can change at any time based upon the type of shift (administrative vs. operational) *and* the number hours worked in an operational shift. JA86–199, JA209, JA1010–1018.

Further, the City admitted to regularly failing to pay the Chiefs' "base pay salary." In fact, if the Chiefs worked fewer than the annual number of hours covered by the base pay salary, the City generally paid the Chiefs based on the number of hours they worked, not the base pay salary. JA1016–1018. Indeed, this is evidenced by "Information Bulletins" issued by the City to "Fire Suppression" employees (including any Chief who worked an operational shift during the year) discussing the same. JA1016–1018. The Information Bulletin for wages paid in 2021 provides:

> *Each year*, there are Fire Suppression employees who do not have the opportunity to work the full 2,912 *hours* to meet their ***base pay salary***. This is due to the different work schedules and transfers which occur during the year.
>
> To address this, Suppression employees that did not have the opportunity to work the 2,912 hours will be paid a supplemental FLS payment to reach their ***base pay***. The supplemental FLS payment for those individuals who qualify will be included in the payroll closing this Friday (2/18/22, checks issued 2/25/22).

37

> For example, in 2021, B shift was only scheduled to work 2,887 *hours* instead of the full 2,912. An individual scheduled on B shift throughout the year would then receive an additional 25 *hours* of FLS pay.
>
> Each individual had their time calculated to see if a change in schedule or shift would impact their hours worked (a switch from B shift to A shift, or a switch from Operational to Administrative schedule). Anyone who worked a 40-*hour* work week during the year had their time converted to a 56-*hour* work week for comparison.
>
> Due to schedules and when an individual might have changed shifts, some were eligible for the additional FLS hours, some were not. If an individual is not eligible for the additional FLS pay, it was due to the fact that they have already worked 2,912 *hours* of regular pay during the calendar year.

JA1016–1018. (emphasis added).

Accordingly, the Chiefs presented the District Court with evidence that the City had a pattern and practice of failing to compensate the Chiefs their full "base pay salary" due to the *quantity* of work (i.e., the number of hours they work in the year). *See* JA1016–1018; 29 C.F.R. § 541.118 (1987). It should be noted that the only employees affected by these deductions classified as exempt are Battalion Chiefs; all other Fire Suppression employees are classified as non-exempt and receive time and a half for their overtime hours (despite also being assigned a "base pay salary."). *See* JA360–362 ("Q So the FLS true-up applies to both exempt and nonexempt employees? A Correct."), JA1016–1018.

Even more troubling, despite the City being aware of the failure to pay the "base pay salary" each year, *see* JA1016–1018, the Chiefs further directed the District Court to evidence that the City has failed to issue true up payments to affected employees in at least five or six years since 2011. *See* JA357–358. When asked why these true up payments were not made, the City's designated representative, Mr. Matthew Bosse, stated "a lot of it had to do with capacity of staffing was the answer *and just we had simply missed the payments*." JA357–358. (emphasis added).

Thus, the District Court was aware of the City's failure to pay the Chiefs their "base pay salary" due to the *quantum of hours* they work in a year. This amounts to illegal deductions under the FLSA. 29 C.F.R. § 541.118 (1987); *Craighead v. Full Citizenship of Md., Inc.*, Civil Action No. 17-cv-595-PX, 2020 U.S. Dist. LEXIS 174747, at *13 (D. Md. Sep. 23, 2020) ("[A]n employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." (internal quotation marks omitted)).

Ultimately, no matter whether the Court considers the City's alleged "guarantees" or the Chiefs' "base pay salary," the evidence overwhelmingly demonstrates that it is not either of these that determine the Chiefs' earnings; rather, it is the type of shift (operational or administrative) and number of hours worked. JA357–358, JA1016–1018. As such, the City failed to prove as a matter of law that

it plainly and unmistakably pays the Chiefs a guaranteed amount (salary) "regardless of the number of hours, days or shifts worked." 29 C.F.R. § 541.604(b). Nor did the District Court make this finding. The City has, therefore, failed to prove that it is entitled to judgment as a matter of law and the District Court's ruling should be reversed.

      f.  <u>The City failed to prove that there is plainly and unmistakably a "reasonable relationship" between any guarantee and the amount the Chiefs actually earn.</u>

To establish that the Chiefs are truly paid on a salary basis, the City must have also shown both (i) that the employment arrangement includes a minimum guaranteed amount, paid on a salary basis, regardless of shifts or hours worked, and (ii) that a reasonable relationship exists between the guarantee and the amount actually received. 29 C.F.R. § 541.604(b).

The minimum guarantee sets "a floor for how much the employee can expect to earn, 'regardless' of how many hours, days, or shifts the employee works" while the reasonable relationship test sets "a ceiling on how much the employee can expect to work in exchange for his normal paycheck" and "prevent[s] the employer from purporting to pay a stable weekly amount without regard to hours worked, while in reality routinely overworking the employee far in excess of the time the weekly guarantee contemplates." *Helix III*, 15 F.4th at 293–94. Thus, the two prongs work together to "ensure[] that the minimum weekly guarantee is not a charade" and to

avoid a situation where "'the salary guarantee [is] nothing more than an illusion.'" *Id.* (citing 69 Fed. Reg. 22122-01 at 22,184).

The reasonable relationship test serves to ensure that employers do not set the guaranteed minimum as "some arbitrary amount unreasonably below the intended rate of pay set simply to avoid overtime payments of the FLSA." *Hood v. Mercy Healthcare Arizona*, 23 F.Supp.2d 1125, 1128 (D. Ariz. 1997). Courts applying the reasonable relationship test have generally found a reasonable relationship where the actual pay received is equal to but not too much higher than the minimum guarantee. *Seiu, Local 721 v. Cty. of Riverside,* No. 08-1746-JTM, 2011 U.S. Dist. LEXIS 168732, at *11–*14 (C.D. Cal. July 29, 2011). The Department of Labor has also stated that the amount of pay received generally should not exceed 1.5 times the guaranteed minimum. *See* Opinion Letter Fair Labor Standards Act (FLSA), 2018 WL 5921453, at *2 ("[A] 1.5-to-1 ratio of actual earnings to guaranteed weekly salary is a 'reasonable relationship' under the regulations."). Conversely, "usual earnings that are nearly 1.8-times—close to double—the guaranteed weekly salary materially exceeds the permissible ratios found in the regulations and are not roughly equivalent to that salary under § 541.604(b)."). *Id.*

Despite this manifest legal obligation, the City provided no competent evidence that the *actual* earnings of the Chiefs are reasonably related to their alleged salary guarantee when their overtime work is factored in along with all other items.

Indeed, the City did not make any effort to compare the Chiefs' *actual* earnings to their alleged salary guarantee; instead, the City removed all overtime compensation to perform their analysis. JA200–205. Without concrete evidence of a reasonable relationship between the alleged guarantee and the *actual* amount employees earn, including for overtime, the City's alleged "salary guarantee [is] nothing more than an illusion." *Helix III*, 15 F.4th at 293–94 (citing 69 Fed. Reg. 22122-01 at 22,184).

Nevertheless, despite clear evidence to the contrary produced by the Chiefs, the District Court adopted the City's argument, holding that a reasonable relationship existed between the alleged guarantees and the Chiefs' actual earnings. In so holding, the District Court stated: "[The Chiefs'] [reasonable relationship] calculations . . . differ because they include overtime pay when determining actual earnings in a typical week. But that approach ignores § 604(b)'s language which limits actual earnings in a typical week to what is earned in a 'normal scheduled workweek,' which should exclude pay for non-scheduled work hours." JA1474. Remarkably, the Court provided no authority for this proposition.

This Court should reject the District Court's radical approach. There is no basis, in 604(b)'s text or otherwise, to conclude that overtime pay should be excluded from a reasonable relationship analysis. Again, the reasonable relationship test sets "a ceiling on how much the employee can expect to work in exchange for his normal paycheck" and "prevent[s] the employer from purporting to pay a stable

weekly amount without regard to hours worked, while in reality routinely overworking the employee far in excess of the time the weekly guarantee contemplates." *Helix III*, 15 F.4th at 293–94. To allow an employer to exclude all overtime pay, as both the District Court and the City define it, would neuter the true purpose of the reasonable relationship test under 604(b).

Regardless, courts have consistently held that an employee's *actual* earnings, not *non-overtime* earnings, are to be considered in this analysis. *See, e.g.*, *Guilbeau v. Schlumberger Tech. Corp.*, No. SA-21-CV-00142-JKP, 2023 U.S. Dist. LEXIS 117614, at *23-24 (W.D. Tex. July 7, 2023) ("Whether the employee retains the exemption despite the additional compensation depends upon whether there is a reasonable relationship between the guaranteed salary and the employee's actual earned pay."); *Vaughn v. Wingo Serv. Co.*, No. 4:20-CV-3915, 2022 U.S. Dist. LEXIS 142105, at *9 (S.D. Tex. Aug. 4, 2022) ("Under § 541.604(b), a reasonable relationship must exist between an employee's guaranteed weekly salary and an employee's actual earned pay."); *Gentry v. Hamilton-Ryker IT Sol., LLC*, No. 3:19-cv-00320, 2022 U.S. Dist. LEXIS 38398, at *15 (S.D. Tex. Mar. 4, 2022) (same); *Sonnier v. Recon Mgmt. Servs. Inc.*, No. 2:20-CV-00002, 2022 U.S. Dist. LEXIS 8086, at *14 (W.D. La. Jan. 14, 2022) ("In other words, 29 C.F.R. § 541.604 allows [the employer] to pay [the employee] more than his guaranteed salary provided that

43

there is a reasonable relationship between the guaranteed amount and the additional sums actually earned.").

To be clear, the Chiefs did not perform their reasonable relationship calculations with a few outsized workweeks, but instead with their *annualized* earnings, as calculated by *the City* itself. JA206–207, JA1199–1201. The Chiefs specifically chose to perform their reasonable relationship analysis on a yearly, rather than weekly, basis. This method ensured that the analysis looked to what the Chiefs "actually earned" not just in a typical week, but a typical year, to average out any fluctuations. Simply, what the City characterized as "voluntary" overtime hours are in essence part of the Chief's expected and actual earnings, as their total yearly compensation demonstrates. JA1199–1201 (showing the Chiefs' total compensation actually earned per year, as calculated by the City).

A good way to illustrate the result of the Chiefs' calculations is through Chief Cook. Of the ten Chiefs in this suit, Chief Cook was the only one to have worked exclusively operational shifts throughout the relevant time period (all other Chiefs worked a mix of operational and administrative shifts), thus making it simple to perform a reasonable relationship analysis. If we assume Chief Cook received a 106 hour "salary guarantee" each biweekly pay period, as the City alleges, then these guarantees bear the following relationship to Chief Cook's total compensation earned (both on an annualized basis):

44

| Time Periods: Date from | Date to | Pay Periods on Operational Schedule | 106 Hour Guarantee (Annual Total) | Total Compensation Earned (Annualized) | RR Ratio |
|---|---|---|---|---|---|
| 1/1/2019 | 1/1/2020 | 26 | $ 125,433.58 | $ 229,008.00 | 1.83 |
| 1/1/2020 | 1/1/2021 | 26 | $ 127,884.20 | $ 234,229.00 | 1.83 |
| 1/1/2021 | 1/1/2022 | 26 | $ 128,901.71 | $ 218,727.00 | 1.70 |
| 1/1/2022 | 12/2/2022 | 26 | $ 136,820.82 | $ 237,761.00 | 1.74 |

JA1199.

These calculations clearly demonstrate that the supposed "salary guarantee" of 106 hours each bi-weekly pay period for an operational shift bears no reasonable relationship to Chief Cook's *actual* earnings. Indeed, the ratio of actual earnings to the purported guaranteed salary was a minimum of 1.7 and a high of 1.83 for Chief Cook from 2019-2022. *Id.* This is very near the same ratio of "nearly 1.8-times" that was found not to meet the requirements under § 541.604(b) by the DOL. DOL Opinion Letter FLSA 2018-25, 2018 WL 5921453, at *2. Moreover, a ratio of 1.7 has been found to be "materially above" the proper limit under a reasonable relationship analysis. *See Vaughn*, 2022 U.S. Dist. LEXIS 142105, at *10 ("An actual pay ratio of 1.7:1, which Defendant admits is what Plaintiff was paid for a considerable part of the time period in question, is materially above the proper 1.5:1 ratio and thus fails under the reasonable-relationship test.").

In other words, a $1,000 weekly "salary" offers an employee who usually earns $1,700 per week no "salary" protections at all. "[P]artial-day deductions [are] not permissible for salaried employees." *See Smith v. Cent. Sec. Bureau, Inc.*, 231 F.

45

Supp. 2d 455, 478 (W.D. Va. 2002); 29 C.F.R. § 541.603(b) (with minor exceptions not relevant here, a salary can only be reduced for full day absences). Under the City's purported salary scheme, because Chief Cook "achieve[d] his 'salary' after [just 106] hours," every two weeks, *Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 184–185 (3d Cir. 1988), he would be entitled to nothing further. Thus, the City could effectively deny Chief Cook (and all other Chiefs) pay altogether for any hours worked above 106 every two weeks. In contrast, a truly salaried employee would receive the full salary (with no deductions at all). 29 C.F.R. § 541.603(b).

In sum, the Chiefs presented the District Court with evidence that the City's alleged 106 hour "bi-weekly guarantee" is so small when compared to the Chiefs' "usual earnings at the assigned hourly . . . rate," 29 C.F.R. § 541.604(b), that it renders their so-called salary "nothing more than an illusion." *Claridge Hotel & Casino*, 846 F.2d at 187; *see also Helix III*, 15 F.4th at 294 (same). But the reasonable relationship test prevents this "charade" by ensuring "that the salary guarantee for such employees is a meaningful guarantee rather than a mere illusion." *Helix III*, 15 F.4th at 294; 69 FR at 22184. Thus, the City fails the reasonable relationship test, and the District Court's grant of summary judgment should be reversed.

## CONCLUSION

Based on the foregoing, the Chiefs respectfully request this Court to reverse the District Court's Judgment, deny the City's summary judgment motion, grant the Chiefs' partial summary judgment motion on liability, and remand the case to the District Court for further proceedings consistent with this Court's instructions.

## STATEMENT REGARDING ORAL ARGUMENT

As the Chiefs raise issues of first impression for this Court, Counsel for the Chiefs respectfully requests oral argument on this matter. Oral argument would help establish and clarify the rule of law, providing guidance on the application of the alternative salary basis test contained in 29 CFR § 541.604(b).

Respectfully submitted this November 13, 2023,

*/s/ Robert W.T. Tucci*
Robert W.T. Tucci
Gregg C. Greenberg
ZIPIN, AMSTER, & GREENBERG LLC
8757 Georgia Ave., Suite 400
Silver Spring, MD 20910
301-587-9373
rtucci@zagfirm.com
ggreenberg@zagfirm.com

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2. Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, this Opening Brief of Appellants contains <u>11,663</u> words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.

Respectfully submitted this November 13, 2023,

<u>/s/ Robert W.T. Tucci</u>
Robert W.T. Tucci
Gregg C. Greenberg
ZIPIN, AMSTER, & GREENBERG LLC
8757 Georgia Ave., Suite 400
Silver Spring, MD 20910
301-587-9373
rtucci@zagfirm.com
ggreenberg@zagfirm.com

*Counsel for Appellants*

48