No. 23-1752

In the

# United States Court of Appeals
## For the Fourth Circuit

―――――――――――

ANTHONY KELLY, GREGORY COOK, GERALD FAIR, JACK HOFFMAN,
CHRISTOPHER KUNKLE, DAVID PLUNKETT, SAMUEL REYES, FREDERICK RUFF,
MICHAEL SHARPE, AND CHAD LALLIER,

*Plaintiffs-Appellants,*

v.

THE CITY OF ALEXANDRIA,

*Defendant-Appellee.*

―――――――――――

On Appeal from the United States District Court
for the Eastern District of Virginia at Alexandria
Civil Action No. 1:22-cv-196
The Honorable Claude M. Hilton

―――――――――――

**BRIEF OF APPELLEE**

―――――――――――

Brian D. Schmalzbach
David F. Dabbs
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
*ddabbs@mcguirewoods.com*

*Counsel for Defendant-Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _23-1752_        Caption: _Anthony Kelly, et al. v. The City of Alexandria_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_The City of Alexandria_
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David F. Dabbs                              Date:      12/20/2023

Counsel for: Appellee The City of Alexandria

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

INTRODUCTION ........................................................................................1

STATEMENT OF THE ISSUE ..................................................................2

STATEMENT OF THE CASE ....................................................................2

I.     Factual Background....................................................................................2

     A.     Job Duties, Assignments, and Schedules.......................................2

     B.     Pay Policies.......................................................................................6

     C.     Payroll Records.................................................................................9

     D.     Application of Pay Policies to Battalion Chiefs .........................13

     E.     Additional Facts Relevant to Plaintiffs' Attacks on Salary
            Basis ...............................................................................................16

II.     Procedural History ...............................................................................20

STANDARD OF REVIEW ........................................................................25

SUMMARY OF ARGUMENT ..................................................................25

ARGUMENT................................................................................................27

I.     Plaintiffs have been paid sufficient amounts on a "salary basis"
     within the meaning of the Department of Labor regulations to
     be exempt, as a matter of law...............................................................29

     A.     The pay system applied to Plaintiffs meets the standard of
            subsection 602(a)...........................................................................30

     B.     The City's use of hourly rates, payment of straight-time
            overtime, and use of paid leave to satisfy salary basis are
            all consistent with U.S. Department of Labor (DOL)
            regulations. .....................................................................................31

     C.     It is undisputed that the City had both a policy of paying
            Battalion Chiefs sufficient "predetermined amount[s]"
            over at least biweekly periods. ......................................................33

D.  Plaintiffs are not hourly employees under *Helix* because they were guaranteed pre-determined amounts over weekly or longer periods.................................................35

E.  *McReynolds* confirms that payment of a specified number of shifts or hours is payment on a salary basis. .........................39

II.  Plaintiffs' contention that salary basis must be guaranteed by contract is contrary to DOL regulations and clear caselaw................41

III.  Plaintiffs identify no improper deductions from Plaintiffs' pay, nor any policy of making the same, that would defeat salary basis.........................................................................................49

A.  Plaintiffs' contentions regarding the City's omission to make *annual* "true-up" payments are irrelevant because the City has not relied on those payments to establish salary basis.....................................................................49

B.  Plaintiffs' reliance on a 2003 memorandum is misplaced.........52

IV.  Plaintiffs' pay is consistent with the "reasonable relationship" test. ...................................................................................53

A.  Plaintiffs use the wrong formula to measure the reasonable relationship...................................................55

B.  Measured properly against payment for their normal work schedules, there is no genuine dispute that the required relationship test is satisfied. .........................................56

C.  The City's guarantees bear a "reasonable relationship" to usual pay for "normal scheduled hours" under any reasonable analysis.......................................................59

CONCLUSION ................................................................61

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Auer v. Robbins,*
    519 U.S. 452 (1997).................................................................. 42-46, 52

*Baden-Winterwood v. Life Time Fitness,*
    566 F.3d 618 (6th Cir. 2009) ...............................................................41

*Blake v. Broadway Servs.,*
    2020 U.S. Dist. LEXIS 60100 (D. Md. 2020).................................... 54, 56-57

*Carrera v. E.M.D. Sales, Inc.,*
    75 F.4th 345 (4th Cir. 2023), *cert. pending,* No. 23-217 ................................28

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984).................................................................................43

*Coates v. Dassault Falcon Jet Corp.,*
    961 F.3d 1039 (8th Cir. 2020)....................................................... 24, 45-46

*Emmons v. City of Chesapeake,*
    982 F.3d 245 (4th Cir. 2020) ...................................................................1

*Encino Motorcars, LLC v. Navarro,*
    584 U.S. ___, 138 S. Ct. 1134 (2018) ...............................................28

*Escribano v. Travis Cty.,*
    947 F.3d 265 (5th Cir. 2020) ........................................................ 44-46

*Gentry v. Hamilton-Ryker IT Sol., LLC,*
    2022 U.S. Dist. LEXIS 38398 (S.D. Tex. Mar. 4, 2022) ..................................58

*Guilbeau v. Schlumberger Tech. Corp.,*
    2023 U.S. Dist. LEXIS 117614 (W.D. Tex. July 7, 2023) ..............................58

*Helix Energy Solutions Group, Inc. v. Hewitt,*
    598 U.S. 39, 143 S. Ct. 677 (2023) ...........................21-23, 26, 35, 38-41, 58, 61

*Higgins v. Bayada Home Health Care Inc.*,
  62 F.4th 755 (3d Cir. 2023) ................................................................46

*Hughes v. Gulf Interstate Field Servs., Inc.*,
  878 F.3d 183 (6th Cir. 2017) ........................................41-42, 45-47

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) .......................................................................43

*Litvinova v. City & Cnty. of San Francisco*,
  615 F. Supp. 3d 1061 (N.D. Cal. 2022) ........................................40

*Litz v. Saint Consulting Grp., Inc.*,
  772 F.3d 1 (1st Cir. 2014) ..............................................................45

*Martin v. Rush, LLC*,
  2021 U.S. Dist. LEXIS 12602 (E.D. Tex. Jan. 22, 2021) .................47

*Mayhew v. Wells*,
  125 F.3d 216 (4th Cir. 1997) ..........................................................48

*McGuire v. City of Portland*,
  159 F.3d 460 (9th Cir. 1998) ..........................................................46

*McReynolds v. Pocahontas Corp.*,
  192 F.2d 301 (4th Cir. 1951) ...........................................26, 39-40

*Orton v. Johnny's Lunch Franchise, LLC*,
  668 F.3d 843 (6th Cir. 2012) ..........................................................41

*Pennington v. Fluor Corp.*,
  19 F.4th 589 (4th Cir. 2021) ..........................................................25

*Reich v. John Alden Life Ins. Co.*,
  126 F.3d 1 (1st Cir. 1997) ................................................................4

*Rodgers v. Basin Sch. Dist. No. 72*,
  2006 U.S. Dist. LEXIS 87716 (D. Idaho Dec. 4, 2006) ............46-47

*Sonnier v. Recon Mgmt. Servs. Inc.*,
  2022 U.S. Dist. LEXIS 8086 (W.D. La. Jan. 14, 2022) ...................58

*United States v. Williams*,
   445 F.3d 724 (4th Cir. 2006)..................................................................29

*Vaughn v. Wingo Serv. Co.*,
   2022 U.S. Dist. LEXIS 142105 (S.D. Tex. Aug. 4, 2022)................................58

*In re Wal-Mart Stores, Inc.*,
   395 F.3d 1177 (10th Cir. 2005)...............................................................37

*West v. Anne Arundel County*,
   137 F.3d 752 (4th Cir. 1998)..................................................................43

**Statutes and Regulations**

Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*............................................1

29 U.S.C. § 255(a)..................................................................................20

Va. Code § 9.1-703.............................................................................16, 53

29 C.F.R. § 541.118.............................................................................43, 45

29 C.F.R. § 541.600...................................................................1, 7, 21, 29, 37

29 C.F.R. § 541.601.................................................................1, 11, 21-22, 27-29

29 C.F.R. § 541.602...................7-8, 16, 21, 25, 29-31, 34, 37-38, 40-41, 43, 46, 51

29 C.F.R. § 541.603.................................................26, 34, 41, 43-44, 47-48, 52

29 C.F.R. § 541.604.................19, 22-24, 26-28, 32, 37-39, 41, 46, 53-55, 58-61

29 C.F.R. § 778.114..............................................................................48

**Other Authorities**

69 Fed. Reg. 22,122 (Apr. 23, 2004) .................................................3-4, 24, 32, 44

DOL Opinion Letter 2018-25,
   https://www.dol.gov/sites/dolgov/files/WHD/legacy/fil
   es/2018_11_08_25_FLSA.pdf ....................................................53-54, 57, 61

U.S. Department of Labor Field Operations Handbook ("FOH"),
https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/
FOH_Ch22.pdf (retrieved Dec. 15, 2023), *linked from*
https://www.dol.gov/agencies/whd/field-operations-
handbook ....................................................................................52, 54

## INTRODUCTION

The ten Plaintiffs have been employed by the City of Alexandria ("the City") in its Fire Department ("AFD") as Battalion Chiefs, whose duties include commanding half of the City's firehouses and other management-level administrative assignments.  Each has been paid in excess of $170,000 a year, including straight-time overtime pay.  They now seek "time and a half" overtime under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), even though they concede that their job duties were sufficient to exempt them from such requirement.  Their claims are based solely on a contention that they were not paid on a "salary basis." 29 C.F.R. § 541.600 *et seq*.

The district court correctly granted summary judgment on their claims.  It is undisputed that the City, as a deliberate policy and practice, ensured their receipt every two weeks of sufficient, predetermined minimum amounts of pay without regard to hours worked, and that they suffered no deductions from such amounts.  Thus, Plaintiffs were paid on a salary basis as a matter of law, and so were fully exempt from FLSA overtime under the "highly-compensated" test of 29 C.F.R. § 541.601. A*ccord Emmons v. City of Chesapeake*, 982 F.3d 245 (4th Cir. 2020) (finding

Battalion Chiefs exempt under the more demanding "primary duty" test).
This Court should affirm.

## STATEMENT OF THE ISSUE

Did the district court correctly grant summary judgment to the City, and deny partial summary judgment to the Plaintiffs, where the City deliberately and consistently paid them predetermined minimum amounts in excess of $684 per week, computed over periods longer than a week and without regard to their actual hours worked, and the Plaintiffs identified no improper deductions from such amounts?

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    Job Duties, Assignments, and Schedules

Battalion Chiefs are high-ranking officers in the paramilitary organization of the AFD, which employs two types of Battalion Chiefs: operational (or "suppression") and administrative (or "desk duty").  These are "command level administrative and management position[s]" as "the commander of a battalion of stations on a shift or as a command level administrative or special operations manager," which "require[] considerable independent judgment and the ability to think quickly and

make sound decisions in emergencies," while operating with "significant autonomy." JA60-61, Dkt. 31-10 at 276-79. AFD Battalion Chiefs have at all relevant times been classified four grades higher than Captains, the next lower rank in the City's public safety pay scale, and their base pay is thus roughly 21% more than Captains at the same step level. Battalion Chiefs are paid salaries on average 24.8% higher than Captains. JA245-246, JA261-267. The Plaintiffs' job duties were described and briefed in detail by the City to the District Court at JA59-61, JA64-73, and JA77-81.

"Operational" Battalion Chiefs (of whom there are up to six at any one time, two each on three shifts) each command a Battalion covering half of the City, each consisting of 4-5 firehouses, 25-35 employees on a shift, and millions of dollars' worth of associated equipment. For most of their hours of work, operational Battalion Chiefs are the highest-ranking AFD employees working. Operational Battalion Chiefs regularly take command of emergency incident scenes,[1] supervise and mentor lower-ranking officers in the performance of work at such scenes and otherwise, and

---

[1] *Compare* 69 Fed. Reg. 22,122, at 22,130 (Apr. 23, 2004) (adopting the 2004 revision to 29 C.F.R. Part 541) ("directing operations at crime, fire or accident scenes" is exempt work).

3

perform numerous other duties that the City contended qualify as executive exempt.

"Administrative" Battalion Chiefs have generally held one of four assignments: Special Operations, Professional Responsibility (or "Training"), Logistics, or Community Risk Reduction. All of these except the Battalion Chief of Special Operations supervise multiple levels of employees who report to them, and all but the Battalion Chief of Training represent the City to outside parties and/or supervise such work.[2] The Battalion Chief of Special Operations supervises the Department's readiness to respond to emergencies involving hazardous materials, technical rescue, and water rescues, and represents the City to numerous regional and working groups with officials of federal, state, and other local governments. The Battalion Chief of Training oversees the AFD's training programs and supervises both permanent and temporary training personnel, including (indirectly) AFD recruits, who are employees assigned to report through the Battalion Chief of Training while being

---

[2] *Compare Reich v. John Alden Life Ins. Co.*, 126 F.3d 1 (1st Cir. 1997), *discussed at* 69 Fed. Reg. 22,122, at 22,145 ("representing the company" is exempt work).

trained in "recruit school."  The Battalion Chief of Logistics supervises AFD's supply, facilities maintenance, and apparatus repair teams, all of which regularly interact with vendors in their respective areas.  The Battalion Chief of Community Risk Reduction ("CRR") supervises the City's fire inspectors, fire marshals, and public information officer, and represents the AFD and the City externally on fire-related safety issues.

The dates of Plaintiffs' assignments to these various Battalion Chief positions are summarized in a chart at JA268.[3]  As indicated there, nine out of the ten Plaintiffs (all but Chief Lallier) have been operational Battalion Chiefs for some period within the maximum three-year limitations period under FLSA (that is, since February 23, 2019).  JA268.  Similarly, nine out of the ten Plaintiffs (all but Chief Cook) have been administrative Battalion Chiefs for some period within the maximum three-year limitations period under FLSA (Chief Kelly only on a temporary basis).  JA268.  Appellants' Brief seems to imply at pages 3-5 that Plaintiffs were reassigned among these positions on a shift-by-shift basis, but as indicated in JA249-258

---

[3] This chart contains one error: Chief Ruff was in fact an operational Captain, not a Battalion Chief, from January 1, 2019 through roughly April 19, 2019.  *See* JA257; Dkt. 31-18 at 4.

(employment histories) and JA268 (chart), they in fact remained in specific

assignments for months and often years at a time, with only periodic

reorganization – most notably in the Spring of 2021, when Chief Reyes was

promoted to Battalion Chief and five of the other nine changed jobs.

Operational Battalion Chiefs are normally scheduled to work 24-hour

shifts on interlocking 9-day cycles, in which each such Chief is scheduled to

work (like the employees they supervise) only on days 1, 3, and 5, for one

of three shifts designated "A," "B," and "C."  *See, e.g.*, JA427 (Kelly Dep.),

JA211-222 (color-coded calendar), and JA664-665 (Hoffman Dep.).

Administrative Battalion Chiefs normally work 40 hours per week.  JA18-

19 and JA41-43 (Complaint and Answer, ¶¶ 41, 43, 47, 52).  There is no

allegation or evidence that these schedules ever varied.

## B.    Pay Policies

The City paid the Plaintiffs fixed, minimum amounts each pay period

that were more than sufficient to satisfy FLSA salary basis requirements.

Its relevant policies and practices are described in the key declaration of

AFD Fiscal Officer Matt Bosse, who assumed that position beginning in

2011.  JA208-210.  As described there in ¶¶ 2-7, the City deliberately

ensured that for all relevant two-week pay periods, operational Battalion

6

Chiefs received at least 106 times an "hourly rate," computed as their quoted annual salary divided by 2912 (the average number of scheduled hours expected to be worked by an operational Battalion Chief over 26 pay periods), and that administrative Battalion Chiefs received at least 80 hours of pay at an hourly rate computed as their quoted annual salary divided by 2080 (the number of scheduled hours to be worked by an administrative Battalion Chief over 26 pay periods). These policies were continued after Bosse's departure from full-time employment with the City on August 25, 2022, as indicated in the Affidavit of his subordinate Harouna Gadio, JA226.

Bosse paid great attention to the City's compliance with FLSA salary basis rules. He is well familiar with the FLSA and Virginia wage and hour laws, JA329-332 (Bosse Dep.), including the salary basis regulations of 29 C.F.R. § 541.600 *et seq.*, which he cited off the top of his head in his deposition, JA355 (Bosse Dep.); *accord* JA208 (Bosse Aff. ¶ 3).[4] Bosse's undisputed testimony in his deposition was that the City deliberately

---

[4] Bosse's command of the FLSA salary basis rules is sufficient that he correctly addressed a hypothetical that opposing counsel posed with insufficient information. *See* JA338-344 (Bosse Dep.), *compare* 29 C.F.R. § 541.602(b).

maintained payment of 106-hour guarantees to operational Battalion Chiefs

for the specific purpose of satisfying FLSA salary basis.  JA356 (Bosse

Dep.), *accord* JA359-360 (*id.*).  His affidavit also shows, also without

contradiction in the record, that AFD deliberately sought to pay exempt

employees consistent with salary basis, in sufficient amounts to satisfy 29

C.F.R. § 541.602, JA208 (Bosse Aff. ¶ 2), and that he regularly reviewed

each Fire Department payroll, beginning before 2019, in part to ensure that

Battalion Chiefs received pay (including paid leave) of at least 80 hours in

each pay period for administrative Battalion Chiefs, JA209 (*id.* ¶ 6), and a

minimum of 106 hours in each pay period for operational Battalion Chiefs,

JA209 (*id.* ¶ 7).

Jen Jenkins, the City's HRIS and Compensation Manager, also

conducted a review of the Battalion Chiefs' pay records to confirm that

they were being paid on a salary basis, in connection with her reviews of

their job duties in 2019 and/or 2020.  JA1051-1053 (Jenkins Dep.).

The City's guarantee to operational Battalion Chiefs was also

described in a memo distributed to employees in roughly 2013 or 2014,

entitled "Popular Questions and Answers About Payroll."  JA385-386

(memo), *discussed at* JA346-349 (Bosse Dep.).  One of the "popular

questions" addressed was "I worked 96 scheduled hours this pay period, how many hours will I get paid for in my paycheck?"  The Answer was:

> Due to the City's current policy, **all Suppression personnel who are on shift work receive 106 hours of regular time pay every paycheck regardless of the hours worked or scheduled**.  This averages out between shorter weeks (96 hours) and longer weeks (120 hours).

JA385 (emphasis added).  Bosse testified in his deposition without contradiction that this remained the City's policy.  JA349 ("that number 3 appears to be correct").  Bosse further explained that if a Battalion Chief works an administrative schedule for the first two-week pay period in a 28-day cycle and then goes on an operational schedule for the second such pay period but is only scheduled to work 96 hours in that period, he would be still paid 106 hours for the second pay period.  JA359-360.

### C.    Payroll Records

The record before the District Court included Plaintiffs' and other AFD Battalion Chiefs' payroll histories from January 1, 2019, through the last payroll issued before the close of primary discovery on December 9, 2022.  JA86 (King Aff.) and JA87-199.  JA200-205 and JA206-207 are analyses of Plaintiffs' salaries and total compensation made in an Excel

workbook from the one large "sheet" (table of rows and columns) that is printed as JA87-198.[5]

Annual and weekly totals of amounts paid as Regular Time (pay code 100) and paid leave[6] are extracted from the payroll data and totaled for each Plaintiff and pay period in JA200-205. As shown, during 2019-2022, Plaintiffs were paid such amounts for their regularly-scheduled hours (including paid leave) at total annual rates ranging from a low of $120,088 (Chief Kelly in 2019) to highs of approximately $150,000 (Chiefs Lallier, Ruff, and Fair in 2022). These amounts are vastly in excess of the $684 per week required to be paid on a salary basis as a condition of exemption under either the "EAP" (executive, administrative and professional) "primary duty" exemptions generally, or under the "highly compensated"

---

[5] An Excel workbook containing the payroll records JA87-198 and showing the derivation of JA200-205 and JA206-207 was emailed to Plaintiffs' counsel on December 19, 2022, pursuant to Federal Rule of Evidence 1006. The City would be happy to email an electronic copy of this spreadsheet to the Court if requested.

[6] As shown in the formulas and by examples throughout the payroll records, the additional paid leave amounts included are Annual Leave (pay code 310), Comp Time Used (311), Sick Leave (312), Family Sick Leave (313), Disability Leave (303), Holiday (304), Funeral Leave (305), FT Paid Parental Leave (318), and "Coop" (Covid-related) Leave (325).

test of § 541.601, regardless of the precise period or method of computation.[7]

As shown in JA200-205, the amounts paid as regular time and paid leave were generally consistent from pay period to pay period, with periodic cost-of-living and step increases (*compare* JA261-266) and other occasional adjustments for reasons noted in the far right-hand column of JA200-205.[8] The salary amounts shown in JA200-205 for operational Battalion Chiefs are slightly lower than for those for administrative Battalion Chiefs with the same quoted salary, only because the operational

---

[7] As shown in JA206-207, Plaintiffs also received *total* compensation (including overtime) during 2019-2022 at annual rates ranging from a low of $170,105 (Chief Kunkle in 2019) to a high of $237,761 (Chief Cook in 2022). Plaintiffs do not contest the application of the "highly-compensated" test under 29 C.F.R. § 541.601, but these amounts are vastly in excess of those required to qualify for that test, regardless of the precise period or method of computation. As noted in the exhibit, the total compensation figures presented in JA206-207 have been adjusted on a *pro rata* basis to reflect annual compensation during the relevant portions of each year in which each Plaintiff was employed as a Battalion Chief. (The annual salary figures presented at the top of JA200 and JA203 are similarly annualized on a *pro rata* basis.) The annual rates of the Plaintiffs' salary amounts and total compensation are thus clearly far above the relevant thresholds.

[8] JA200-205 is a 3x2 matrix of six pages, printed "down, then over." Similarly, JA206-207 is two pages, intended to be viewed side-by-side.

guarantee for a two-week pay period was 106 hours rather than 112 (the average number of hours scheduled in such a period). 112 hours at operational rates would have yielded amounts identical to 80 hours at administrative rates (which were higher by a factor of 2920÷2080=1.4), for an employee with the same quoted annual salary. Thus, aside from occasional raises, the variations over time in each Plaintiff's salary amounts shown in JA200-205 generally reflect their movement back and forth between operational and administrative positions.[9]

The payroll records presented in JA87-198 show that the City has made consistent payment of the 80- and 106-hour guarantees described in Bosse's affidavit and deposition, either by regular pay or paid leave time. These records reflect approximately 36 employee-years of work for which the payments described were consistently made, over the entire relevant statutory period, and Plaintiffs have not identified, cannot cite, and do not rely upon any occasion when they were not.

---

[9] Viewed another way, a transfer of an administrative Battalion Chief to an operational position would reduce the salary guarantee only to 75.71 hours at the administrative rate (106÷1.4), which amounts still easily exceed the $684 weekly minimum (and were still 53/56ths and thus 94.64% of the average earnings for a normal administrative workweek).

### D.      Application of Pay Policies to Battalion Chiefs

As shown by the payroll records, the City successfully ensured at all relevant times that operational Battalion Chiefs received a minimum of 106 hours per two-week pay period, as either regular pay or paid leave, and a minimum of 216 hours per 28-day pay cycle, including regular pay and paid leave—the latter also including at least four hours of what is referred to as "FLS" pay, for scheduled hours in excess of 212 in a 28-pay pay cycle. The guarantee of 106 hours' pay for operational Battalion Chiefs is only slightly less than what administrative Battalion Chiefs always received for their 80 scheduled hours every two weeks, by a ratio of 106/112 = 94.64%.

The 106-hour rule was frequently applied to pay operational Battalion Chiefs for hours in excess of those they worked in the pay period being compensated.  For example, consider two specific 28-day pay cycles for Chief Cook, one for the paychecks dated January 29 and February 12, 2021, and one for the paychecks dated May 21 and June 4, 2021, JA179-180. Chief Cook was assigned at these dates to supervise Battalion 211 on shift

"A." [10]  *See* JA249 (employment history).  As indicated by the presence of

"FLS" pay (code 240) in the second paycheck for each cycle, these were

each, respectively, the first and second paychecks of two different 28-day

work cycles.  JA324; Dkt. 31-11 at 252-54 ("FLS Chart").  Of those two 28-

day work cycles, the January-February cycle included 137 scheduled hours

in the first 14-day pay period (the maximum, per JA209, Bosse Aff. ¶ 4)

followed by 96 scheduled hours (the minimum) in the second 14-day pay

period.  The May-June cycle had the same pattern reversed.  Both cycles

illustrate the operation of the City's guarantee to ensure payment even

where hours were not scheduled or worked, and were specifically argued

to the district court below.  JA1257-1258.

In the May-June cycle, in his paycheck for the first pay period, Chief

Cook was paid 106 hours in regular time and paid leave, even though he

had only 96 hours scheduled on his shift, and 24 of *those* were taken as

annual leave.  He thus received payment for 82 hours of regular time

(including the 72 he actually worked), plus 24 hours of annual leave, total

---

[10] Alexandria's numbers for Firehouses and Fire Battalions are in the 200's
to distinguish them from those in nearby jurisdictions, which start with
different digits.

106. Then, in the June 4 paycheck for the second pay period, in which he had 137 scheduled hours, he received 106 hours regular time plus 21 hours of "FLS" time, thus a total of 127 hours for scheduled time – rather than the 137 actually worked, because he had been subsidized (in effect) by 10 hours in the first pay period. The 106-hour guarantee thus operates to smooth and reduce variation in operational Battalion Chiefs' pay, both up and down.

In the January-February cycle cited above, in his first paycheck Chief Cook was paid 106 hours regular time (even though he had worked 137) and then in the second paycheck, he was paid 94 hours regular time plus 12 hours of paid leave (and 21 hours of "FLS" time, also for scheduled hours), thus a total of 233 for both pay periods, which is the maximum number of scheduled hours in a 28-day pay cycle (again, the maximum, per JA209, Bosse Aff. ¶ 4), plus some overtime. Note that in this case Chief Cook again received a total of 127 hours of regular and FLS pay in the second pay period. The 106-hour guarantee thus operates to smooth and reduce variation in operational Battalion Chiefs' pay for scheduled hours *in either direction*, that is, regardless of the pattern of variation in scheduled hours.

15

As shown by these examples, the City's guarantees of 106 operational or 80 administrative hours' pay applied even where scheduled hours went unworked, because the difference was paid as paid leave. *Compare* 29 C.F.R. § 541.602(a) ("a predetermined amount"); *accord* JA209 (Bosse Aff. ¶ 6). Because paid leave was counted toward the overtime thresholds of 80 per pay period for administrative and 216 per 28-day work cycle for operational, each consistent with the treatment required of non-exempts under Va. Code § 9.1-703, the scheduled hours were paid in full even where overtime (work not included in the normally-scheduled hours) was worked in the same pay period (for administrative Battalion Chiefs) or in the same 28-day pay cycle (for operational Battalion Chiefs). *See, e.g.*, JA153 (Hoffman 9/25/20 and 10/9/20) (administrative), JA179 and JA185 (Cook 1/15/21 and 10/7/22) (operational).

## E.    Additional Facts Relevant to Plaintiffs' Attacks on Salary Basis

Plaintiffs rely on the City's omission to consistently make annual "true up" payments to operational personnel when their scheduled hours fell slightly short of the expected average of 2912 hours over certain periods of 52 weeks (or 26 pay periods, or 364 days) that corresponded

roughly to calendar years. *See* JA1016-1018. As shown above, operational

Battalion Chiefs can expect 2912 scheduled hours over an average period of

52 weeks, 26 pay periods, or thirteen 28-day pay cycles, which would result

in their receipt for those scheduled hours of the exact amount of their

quoted annual salaries. In practice, payments for normal scheduled hours

(whether worked or taken as paid leave) vary for different 52-week

periods, but only slightly. *See* FLS Chart, *supra* (showing that for Dec. 12,

2020, through Dec. 10, 2021, "B" shift had 2887 hours scheduled, the

minimum, while "A" shift had 2921 and "C" shift had 2928, the maximum,

each within 1% of the long-term average of 2912).[11]

---

[11] 2887 is the minimum because the four 28-day cycles that repeated at the beginning and end of this 52-week period for "B" shift had the fewest total hours scheduled (871) of any continuous set of four 28-day cycles that can occur, while the four 28-day cycles that similarly repeated for "C" shift had the highest hours of any such set of four continuous 28-day cycles (with a total of 912 hours scheduled).

Because the City's 28-day cycles simply rotate, one day at a time, through the nine possible starting dates among the 9-day scheduling cycle, total scheduled operational hours (and thus operational Battalion Chiefs' earnings for those hours) will in fact be the same over any period of 36 weeks, 18 pay periods, or nine 28-day cycles, regardless of when such periods begin and end – slightly higher than the guaranteed biweekly and 28-day minimums for operational, and in fact equal to the guaranteed pay for scheduled hours of an administrative Battalion Chief with the same quoted salary for the same period.

The average of 2912 hours scheduled over 52 weeks for operational Battalion Chiefs results in slightly more than the 106 hours' pay per pay period on which the City relies to satisfy salary basis, which total "only" 2756 hours per year (53 hours x 52 weeks = 106 hours x 26 pay periods = 2756). Thus, the annual true-up payments were not mentioned or relied upon in the City's Motion for Summary Judgment, JA57-85, and they are not relied by the City upon on appeal. The annual true-up issue also has no application to administrative Battalion Chiefs, per the memo on which the Plaintiffs rely. JA1016-1018 (applicable to "Suppression employees" only).

In their Brief at pages 5, 12, and 20, Plaintiffs rely on a 2003 City memorandum, which stated that the City follows an "hours paid" rather than an "hours worked" policy. JA1010-1015; *see* JA1010. The City contends that these phrases refer to a practice of counting paid leave as hours worked in applying overtime thresholds, which is permissible. In any event, the cited memorandum did not and has not been claimed to provide for any deductions from exempt employees' pay that would violate salary basis.

Finally, plaintiffs attack the City's salary basis by asserting that the City's guaranteed amounts did not bear a "reasonable relationship" to their normal pay as required by 29 C.F.R. § 541.604(b). As discussed below, the reasonable relationship test under subsection 604(b) compares the guaranteed amount to "the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek." *Id.* It is undisputed here both that the Plaintiffs *had* a normal schedule, and how their normal, scheduled hours were distributed over time. *See* JA427 (Kelly Dep.); JA539 (Plunkett Dep.); JA664-665 (Hoffman Dep.) ("a regular schedule, yes"); JA854-855 (Sharpe Dep.).

Battalion Chiefs were paid for any overtime hours in excess of their normal schedules, at "straight-time" rates, but a large proportion of the Plaintiffs' overtime over the relevant period was voluntary. Over the same period reflected in the payroll records, the City's records reflect that the portion of Plaintiffs' combined overtime recorded on various codes indicating that it was voluntary (most importantly "MSH," for Minimum Staffing Hire) was 87.8%. JA1231-1234, JA1271-1273 (Cross and Bellomo Affs.). For Chief Cook in particular, whose data the Plaintiffs use as their example on page 45 of their Brief, voluntary overtime has comprised 91.7%

19

of his total overtime hours (5639.25 ÷ 6147.5 = .9173). As shown at JA1273, the largest gap between "Total Known Voluntary OT Worked" and "All OT Worked" for any plaintiff in any calendar year is 222 hours by Chief Cook in 2022 (1448 minus 1226). Since that total was accrued in 24 pay periods, the average amount of such time for him during that year was 4.625 (222/48) hours per week or 9.25 (222/24) hours per pay period. These figures will be used below.

## II.    Procedural History

Plaintiffs filed their original Complaint against the City on February 23, 2022. JA4 (Dkt. 1).[12] Discovery concluded on December 9, 2022, except for one deposition on January 13, 2013, of Jen Jenkins, a City human resources official who had been on leave while other depositions were taken. JA5-6 (Dkt. 12, 17). For reasons related to 2022 changes in the Virginia Overtime Wage Act and the departures of Chiefs Ruff and Fair from City employment, the parties both amended their pleadings, with leave of court, shortly after discovery closed. JA12-36; JA37-56.

---

[12] The maximum limitations period under FLSA is three years for willful violations, so the earliest date at issue is February 23, 2019. 29 U.S.C. § 255(a).

The City moved for summary judgment, in part on the grounds that Plaintiffs regularly and customarily performed at least *some* exempt duties, sufficient to qualify them for exemption under the "highly compensated" test of 29 C.F.R. § 541.601.  JA77-81.  On motions for summary judgment, both the City's and their own partial motion, Plaintiffs contested neither the application of the "highly compensated" test, or that their duties satisfied it, *see* JA1204-1205 and JA1256, nor do Plaintiffs challenge either point in their Brief on appeal.  The Parties' briefing on summary judgment thus focused only on the question of whether the Plaintiffs had been paid on a salary basis within the meaning of 29 C.F.R. § 541.600 *et seq.*

Two days before a summary judgment hearing scheduled on February 24, 2023, the U.S. Supreme Court decided *Helix Energy Solutions Group, Inc. v. Hewitt*, 598 U.S. 39, 143 S. Ct. 677 (2023).  In *Helix*, the Supreme Court considered an oil-rig worker who was paid on a daily rate, which exceeded the then-current weekly salary requirement (now $684), but without any (other) form of guarantee or minimum, weekly or otherwise.  The Court found that Hewitt was not paid on a salary basis under § 541.602 because he did not receive a predetermined amount "on a weekly or less frequent basis" as required by the text of the rule, and it was

21

conceded that he could not qualify as paid on a salary basis under the alternative rule of § 541.604(b). The Parties here addressed *Helix* at oral argument, JA1357-1400, but the Court also requested and received supplemental briefing on *Helix*, JA1404-1449 and JA1450-1463, before granting summary judgment for the City and denying to the Plaintiffs on June 13, 2023.

In its decision, JA1464-1479, the District Court held that the City had the burden to prove exemption, at JA1470. The court found that "operational Battalion Chiefs were paid at least 106 hours' worth of pay each pay period, even when they worked less than 106 hours in the relevant two-week period," and that "administrative [Battalion Chiefs] [were] always scheduled" a minimum of "40 hours of work per week" and were therefore always paid a minimum of "80 hours' worth of work" every two weeks. JA1467. The court also concluded that from 2019-2022, "Plaintiffs' total annual compensation ranged from $170,105 to $237,761," and "Their annual compensation for regularly-scheduled work (plus paid leave) ranged from $120,088 to over $150,000." JA1467. The Court applied the "highly-compensated" (or "HCE") test of 29 C.F.R. § 541.601, finding

that "the parties do not dispute that its basic annual compensation threshold has been met."  JA1469.

The court found that Plaintiffs were paid on a salary basis under § 541.604(b), for two reasons.  First, they received weekly guarantees of a sufficient amount because they "were guaranteed 106 hours' worth of pay every two weeks as operational [Battalion Chiefs] and 80 hours' worth of pay every two weeks as administrative [Battalion Chiefs]," "without regard to hours worked," as "illustrated by the fact that operational [Battalion Chiefs] were still paid at least 106 hours' worth of pay even when they worked fewer than 106 hours…"  JA1472-1473.  The Court distinguished *Helix* on the grounds that there, by contrast, "the employee's pay was completely determined by the number of days worked in a week."  JA1473.  Second, the Court found that "there is a reasonable relationship between these guarantees and actual earnings in a normal scheduled workweek."  JA1473.  For operational Battalion Chiefs, the Court found it undisputed that the maximum amount that could be earned for scheduled hours in a normal workweek was 72 hours of pay, and therefore computed that the maximum possible ratio for a week was 72/53=1.3585, less than the Department of Labor's 1.5 guideline, while administrative Battalion Chiefs

23

had a "ratio of 1." JA1474. The Court rejected Plaintiffs' calculations including overtime on the grounds that they ignored the language of § 541.604(b) considering only earnings in a "normal scheduled workweek," as argued by the City. JA1474.

Finally, the District Court rejected Plaintiffs' argument that the minimum pay cited by the City could not be considered a guarantee in the absence of an explicit contractual promise. JA1474. Citing *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1048 (8th Cir. 2020), the Court held that a "guarantee" under § 541.604(b) depended on an employer's practice, JA1474, but that "[h]ere, payroll records confirm that no such improper deductions took place." JA1475.

The District Court also considered whether the City had carried its burden as to Plaintiffs' job duties, despite the Plaintiffs "not provid[ing] any arguments" on this point. JA1476. But the court found that the City's evidence had established the performance of at least some exempt duties, as required under the highly-compensated test, including some described in 69 Fed. Reg. 22,122, at 22,130. Thus the Court found that the Plaintiffs were properly FLSA exempt. Judgment was ordered, JA1480, and

24

Plaintiffs filed a timely notice of appeal to this Court on July 12, 2023,

JA1481.

## STANDARD OF REVIEW

This Court reviews a district court's order granting summary

judgment *de novo* and affirms where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."

*Pennington v. Fluor Corp.*, 19 F.4th 589, 595 (4th Cir. 2021).

## SUMMARY OF ARGUMENT

The district court correctly granted summary judgment that Plaintiffs

were covered by the "highly compensated" exemption because there is no

genuine dispute that they were paid on a salary basis.  The undisputed

facts relied upon by the City are sufficient to establish that Plaintiffs were

paid on a salary basis consistent with 29 C.F.R. §§ 541.602 and/or .604 at all

relevant times.

Both operational and administrative Battalion Chiefs received on a

biweekly basis minimum pre-determined amounts exceeding $684 a week,

as required by 29 C.F.R. § 541.602(a), without deduction.  The City's use of

hourly rates, payment of straight-time overtime, and use of paid leave as

part of these pre-determined amounts are all approved by DOL

regulations.  And it is undisputed that the City has shown it consistently paid these amounts as a deliberate policy to comply with FLSA salary basis, without deduction.  The *Helix* case is inapplicable because Plaintiffs' guarantees were computed and paid on a biweekly basis without regard to their hours worked, and the City provided a guarantee as required by § 541.604(b).  The adequacy of the City's guarantee is also directly supported by this Court's 1951 decision in *McReynolds*, *infra*.

Plaintiffs contend that salary basis must be legally enforceable by employees, but their position is inconsistent with 29 C.F.R. §§ 541.603 and 604.  That inconsistency has been recognized by other Circuits correctly holding that Plaintiffs must identify actual improper deductions to show that an employer did not intend to pay on a salary basis.  Regardless, this court has recognized in similar circumstances that a "clear mutual understanding" can be implied for FLSA purposes, which would also be an "employment arrangement" under §§ 541.604.

Plaintiffs' claims regarding the City's omission to make annual true-up payments are irrelevant to salary basis because the City pays the relevant predetermined amounts on a biweekly, not annual, basis.   A 2003

memorandum on which they rely addresses overtime thresholds, not salary basis.

Finally, the City's predetermined salary payments bear a "reasonable relationship" to Plaintiffs' earnings for their normal work schedules as required by § 541.604(b). Plaintiffs' calculations including overtime are inconsistent with the plain language of the regulation. Per DOL, the relevant ratio should not exceed 1.5 over long periods, but the City's ratios cannot exceed 1.3585 even for a single week, and cannot exceed roughly 1.06 over long periods, or 1.15 even if "worst-case" involuntary overtime were considered. For these reasons the district court correctly found that Plaintiffs were exempt under the highly-compensated exemption of 29 C.F.R. § 541.601.

## **ARGUMENT**

Plaintiffs concede that the District Court recognized the correct standard for summary judgment, and found that the City had the burden of proof on its affirmative defense that Plaintiffs were exempt. Appellants' Brief at 16. They complain at pages 15-22 of their Brief that the District Court did not apply a requirement of "clear and convincing" evidence, *id.* at 17-18, or that exemption be shown "plainly and unmistakably," *id.* at 18

27

n.6, and/or "ignored key evidence presented by the Chiefs," *id.* at 18-22, but these points all simply reflect the district court's correct interpretations of the law. Under a proper view of the law, the undisputed facts relied upon by the City compelled summary judgment for it, and the list of seven items cited by Plaintiffs at pages 19-20 of their Brief are either mischaracterized or irrelevant.

The absence of discussion in the District Court's opinion of the standard of proof evidently reflects that it did not consider any particular such standard to be decisive. At the time of its decision, of course, the District Court of course did not have the guidance of *Carrera v. E.M.D. Sales, Inc.*, 75 F.4th 345 (4th Cir. 2023), *cert. pending*, No. 23-217, which was not decided until a month later.[13]

Plaintiffs have conceded below on summary judgment (and now again on appeal) that their duties met the required standard for FLSA exemption, and/or that the "highly-compensated" test of 29 C.F.R.

---

[13] The City here contends that under *Encino Motorcars, LLC v. Navarro*, 584 U.S. ___, 138 S. Ct. 1134 (2018), the "clear and convincing evidence" standard (or the equivalent "clearly and unmistakably" standard) no longer applies to FLSA exemptions. But the City recognizes that the panel is bound by *Carrera*. The City thus preserves this argument for further review.

§ 541.601 applies.  Arguments not made in a party's opening brief are

waived.  *United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006).

Thus, the Plaintiffs have waived any possible contention about their duties

or the application of the "highly-compensated" test.[14]  The District Court

correctly held without opposition that the City had carried its burden

regarding duties under the highly-compensated test of 29 C.F.R. § 541.601.

Plaintiffs' appeal is thus entirely devoted to their contention that they were

not paid on a salary basis.

## I.    Plaintiffs have been paid sufficient amounts on a "salary basis" within the meaning of the Department of Labor regulations to be exempt, as a matter of law.

To be exempt, employees must be compensated on a "salary basis" at

a rate of not less than $684 a week, or a similar *pro rata* rate for a longer

period.  29 C.F.R. §§ 541.600(a), (b).  To qualify, § 541.602(a) provides that

an employee must "regularly receive[] each pay period on a weekly, or less

---

[14] Where an employee's total annual compensation has exceeded $100,000 or $107,432 per year (the thresholds in effect before and after January 1, 2020), such a level of compensation is itself "a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."  29 C.F.R. § 541.601(c).  As a result, the law then requires only that an employee "customarily and performs *any one or more* of the exempt duties or responsibilities of an executive, administrative, or professional employee."  *Id.* (emphasis added).

frequent basis, a *predetermined* amount constituting *all or part* of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed," (emphasis added), except by a lengthy list of exceptions provided in subsection 602(b), none of which are at issue.

**A.    The pay system applied to Plaintiffs meets the standard of subsection 602(a).**

It is undisputed that the minimum amounts regularly and consistently received by the Plaintiffs over biweekly and longer periods exceeded the rate of $684 a week required to be paid on a salary basis as a condition of exemption.  For each pay period shown in the payroll records, each Plaintiff then employed as a Battalion Chief received regular pay and paid leave time totaling at least a pre-determined minimum amount that was equal to either 106 hours of pay at an operational rate or 80 hours of pay at an administrative rate (depending on the position to which the Chief was then assigned).  The evidence shows that these amounts were "pre-determined" because they arose from the Plaintiffs' status as operational or administrative Battalion Chiefs and their quoted annual salaries.  *Compare* JA993-1009 *with* JA207-208.  They satisfy the requirement that they be paid

"on a weekly, or less frequent basis" because they were each measured and determined for a two-week pay period.

Nor did Plaintiffs suffer any deductions from these salary amounts. As the district court found, "payroll records confirm that no such improper deductions took place as BCs were always given at least 106 or 80 hours worth of pay regardless of the hours worked." JA1475. This was not an accident. These amounts were paid deliberately by the City to comply with FLSA salary basis rules and applied even where Plaintiffs worked fewer than the relevant numbers of hours, JA208-209 (Bosse Aff.), because any difference was made up as paid leave, JA200-205. These facts are by themselves sufficient to establish that the minimum amounts the City paid to Plaintiffs and the method of those payments both satisfy the FLSA's "salary basis" requirements under subsection 602(a).

**B.    The City's use of hourly rates, payment of straight-time overtime, and use of paid leave to satisfy salary basis are all consistent with U.S. Department of Labor (DOL) regulations.**

Plaintiffs contended at various times that they cannot have been paid on a salary basis because they were paid straight time overtime for excess hours worked, because their pay was computed on an hourly basis, and/or because they were required to use paid leave to cover shortfalls in their

31

hours worked.  Such contentions have no basis in the governing law.  As

29 C.F.R. § 541.604(a) explicitly provides, "An employer may provide an

exempt employee with additional compensation without losing the

exemption or violating the salary basis requirement, if the employment

arrangement also includes a guarantee of at least the minimum weekly-

required amount paid on a salary basis."  Such additional compensation

may be paid "on any basis."  *Id.*  The City's practice of providing additional

straight-time hourly pay is thus specifically approved by DOL as compliant

with salary basis.  Similarly, 29 C.F.R. § 541.604(b) provides that "An

exempt employee's earnings may be computed on an hourly, a daily or a

shift basis, without losing the exemption or violating the salary basis

requirement."  Nor are deductions from Plaintiffs' paid leave balances

availing to them, as it is long established that "Employers, without

affecting their employees' exempt status, may take deductions from

accrued leave accounts; may require exempt employees to record and track

hours; [and] may require exempt employees to work a specified schedule."

69 Fed. Reg. 22,122, at 22,178-79 (citing cases and authorities).

**C.    It is undisputed that the City had both a policy of paying Battalion Chiefs sufficient "predetermined amount[s]" over at least biweekly periods.**

At pages 33-34 of their Brief, Plaintiffs rely on several cases indicating that an employer asserting salary basis must show the existence of a guaranteed payment of the relevant salary amount.  But contrary to the Plaintiffs' resulting argument at pages 35-37 of their Brief, the City has made such a showing – affirmative and undisputed – that it had a policy, as well as a practice, of paying the consistent minimum amounts described above on a bi-weekly basis, and that it has consistently complied with that policy.

Plaintiffs largely ignore the City's evidence that it paid Battalion Chiefs consistent, predetermined minimum amounts each two-week pay period.  However, as to operational Battalion Chiefs, they accept (and in fact adopt as their own contention) that the City "chooses" to pay a minimum of 106 hours of pay for each two-week pay period, regardless of hours actually worked, specifically for the purpose of providing them with more consistent and less variable pay.  JA973-974 (¶ 18).  Bosse's uncontroverted affidavit and the City's payroll records each show similarly and deliberately unvarying payment of minimum biweekly amounts of 80

33

hours of pay to administrative Battalion Chiefs.  These minimum payments all vastly exceeded the $684 weekly minimum amount required to be paid on a salary basis by 29 C.F.R. § 541.602(a).

The conclusion that the City has demonstrated a sufficient policy and practice of paying on a salary basis is also supported by 29 C.F.R. § 541.603, which describes the circumstances under which an employer might lose an exemption based on salary basis violations.  Under § 541.603(a), exemption is lost only if "the facts demonstrate that the employer did not *intend* to pay employees on a salary basis" (emphasis added), which can be shown by an "actual practice" of making improper deductions.  Even actual improper deductions will not result in the loss of exemption if they "are either isolated *or* inadvertent" (emphasis added) and the employees are reimbursed.  It would be anomalous in the extreme if an employer like the City here, which did not make any improper deductions, were held to a higher standard than an employer who did make such deductions.  Bosse's and Jenkins' evidence clearly establishes the City's intention to pay on a salary basis.  As consistent with section III below, Plaintiffs have not and cannot identify or rely on even a single example of an improper deduction from any of their pay over the course of nearly four years of employment.

**D. Plaintiffs are not hourly employees under *Helix* because they were guaranteed pre-determined amounts over weekly or longer periods.**

Plaintiffs contend at pages 22-24 and 29-32 of their Brief that they are "hourly-rate employees," and thus non-exempt under *Helix*, based on a contention that the City's biweekly guarantees were improperly "computed" on hourly rates, apparently because each guarantee was an amount described as an hourly rate (derived from their salaries) multiplied by a number of hours. Appellants' Brief at 30 (last sentence). This twists *Helix* beyond recognition.

Plaintiffs are *not* "hourly-rate" or "hourly-basis" employees within the meaning of *Helix* because it is undisputed that their pay was *not* determined *solely* by their numbers of hours worked. *See Helix*, 143 S. Ct. at 680 ("...a daily-rate worker, who *by definition* is paid for is paid for each day he works and no others") (emphasis added), and *id.* at 686 ("A daily-rate worker's weekly pay is *always* a function of how many days he has labored") (emphasis added); *compare* JA209 (Bosse Aff. ¶¶ 6 and 7, *e.g.*, "[The City's] practice often required that [operational] Battalion Chiefs be paid during the first pay period of a 28-day work cycle for hours in excess of those they actually worked."). *Helix* is thus readily distinguishable, and

35

does not suggest, much less compel, a finding that Plaintiffs were non-exempt.

In this case, instead, it is undisputed that the City deliberately ensured Plaintiffs' biweekly receipt of amounts computed as specific proportions of their quoted annual salaries, of which "106 hours" for an operational Battalion Chief constituted 3.64% of the annual salary amount (106/2912=.0364), and "80 hours" for an administrative Battalion Chief constituted 3.85% of the annual salary amount (80/2080=.03846). It is undisputed that the Plaintiffs actually received these amounts. *See* JA86-199, JA200-205. It is further undisputed that the City in fact adopted the "106 hour" minimum biweekly payment for operational Battalion Chiefs for the purpose of reducing variation in their base pay between pay periods. *See, e.g.,* JA973-974 (Plaintiffs' Statement of Undisputed Facts, ¶ 18); JA1154-1155 (Response to Defendant's Statement of Undisputed Facts, ¶ 3.e.). And it is further undisputed that the application of this minimum amount actually operated to reduce variation in operational Battalion Chiefs' pay on a regular basis, when they worked only 96 scheduled hours in a two-week pay period but still received payment of the amount computed as 106 hours, without regard to their hours actually

worked.  *See, e.g.,* JA1327-1356 (Plaintiffs' substantially identical Affidavits, each at ¶ 8).  For both types of Battalion Chiefs, the amounts of these payments were more than sufficient to satisfy the minimum salary amount of $684 per week required by 29 C.F.R. §§ 541.600 and 541.604.  These facts satisfy all of the requirements of the salary basis test.

Consistent with 29 C.F.R. § 541.602(a), Plaintiffs have, by virtue of the guarantee, "receive[d] each pay period, on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount [was] not subject to reduction because of variations in the quality or quantity of the work performed."  The biweekly amounts were pre-determined, at any given time, based on each employee's established salary amount and the systems described, with only occasional transitions between operational and administrative based on *bona fide* changes in job duties.  *Compare* JA268 (assignment chart) *with In re Wal-Mart Stores, Inc.*, 395 F.3d 1177, 1183-89 (10th Cir. 2005).  Plaintiffs in fact concede this aspect of the case, when they confirm in their affidavits that the City pays them for all hours "scheduled," JA1327-1356 (Plaintiffs' Affidavits, ¶ 7) – rather than hours worked – as it is undisputed that the schedules never varied, and that Plaintiffs in fact received these amounts.

37

Thus, the City's policy and practice of paying Battalion Chiefs a minimum, pre-determined amount complies with § 541.602(a) as interpreted by the *Helix* Court: "Whenever an employee works at all in a week, he must get his 'full salary for [that] week' – what §602(a)'s prior sentence calls the 'predetermined amount.' That amount must be 'without regard to the number of days or hours worked' – or as the prior sentence says, it is "'not subject to reduction because' the employee worked less than the full week." *Helix*, 143 S. Ct. at 686 (quoting 29 C.F.R. § 541.602(a)).

*Helix* explained that there are two methods an employer can use to establish salary basis: 29 C.F.R. §§ 541.602(a) and 541.604(b), which "offer non-overlapping paths to satisfy the salary-basis requirement." 143 S. Ct. at 689. Under *Helix*, however, the City satisfies the salary-basis requirement not only through § 541.602(a), but through § 541.604(b), as well. Analyzed under the *Helix* Court's reading of § 541.604(b), Plaintiffs are also paid on a salary basis because the City "add[s] to [their] per-[hour] rate a weekly guarantee that satisfies § 604(b)'s conditions," 143 S. Ct. at 691 (including the "reasonable relationship" requirement, addressed in Part IV below). As both *Helix* and 29 C.F.R. § 541.604(b) make clear, an employee whose pay is otherwise "computed" on an hourly basis can *also*

38

receive a guarantee of a minimum amount on a weekly or less frequent

basis that will be sufficient to satisfy the salary basis requirement.  *See*

*Helix*, 143 S. Ct. at 691 ("Helix could come into compliance…[by adding] to

Hewitt's per-day rate a weekly guarantee that satisfies § 604(b)'s

conditions").  Plaintiffs diligently ignore it, but that is *exactly* what the City

did here.

**E.   *McReynolds* confirms that payment of a specified number of shifts or hours is payment on a salary basis.**

If there remained any doubt that the City's pay system here provided

a sufficient salary guarantee to both operational and administrative

Battalion Chiefs, such doubt should be dispelled by the Fourth Circuit case

of *McReynolds v. Pocahontas Corp.*, 192 F.2d 301 (4th Cir. 1951).  In

*McReynolds*, the Fourth Circuit considered whether mine foremen were

paid on a salary basis where they were guaranteed three shifts a week, for

which the pay was sufficient to satisfy the then-current amount required by

the salary basis test.  This Court reasoned:

> [W]hat possible difference can it make whether a man is
> guaranteed a certain weekly wage or a certain number of
> shifts which will produce a specific wage?  In our
> opinion, what the Regulations mean by a 'salary basis' is
> a guaranteed wage whether the Company operates or

39

not.  **Any formula which results in such a guarantee is sufficient.**

192 F.2d at 303 (emphasis added); *accord Litvinova v. City & Cnty. of San Francisco*, 615 F. Supp. 3d 1061, 1068 (N.D. Cal. 2022) ("This is a guarantee of a minimum amount of compensation.").  The application of this reasoning is clear, and is not abrogated by any intervening change in the salary basis regulations: the City's guarantee of amounts arising from the Plaintiffs' fixed and recurring schedules (which for operational Chiefs varied only within permissible limits and for administrative Chiefs not at all), is sufficient to satisfy salary basis requirements.

*McReynolds*' focus on the wage guarantee itself, and not on the formula used to calculate it, is perfectly in line with *Helix*.  The *Helix* Court explains that § 602(a)'s "weekly basis" requirement "typically refers to the unit or method of calculating pay," 143 S. Ct. at 677, but the *Helix* Court's definition of salary basis does not hinge on whether an employee's pay is broken down into weekly, daily, or hourly increments on their paystub. Rather, it is the existence of a predetermined, guaranteed amount based on a work period of a week or longer that determines if the salary-basis requirement has been met: "§ 602(a)'s demand that a salaried worker get a

preset, fixed amount 'on a weekly[] or less frequent basis' means that his

paycheck reflects how many weeks—not days or hours—he has worked."

*Id.* at 688 (quoting § 541.602(a)).  Again, that is exactly how the City paid

preset, fixed amounts to the Plaintiffs.  Thus the City meets the FLSA salary

basis requirement under the precedent of the Fourth Circuit and the

Supreme Court.

## II.    Plaintiffs' contention that salary basis must be guaranteed by contract is contrary to DOL regulations and clear caselaw.

At pp. 25-28 and 32-35 of their Brief, Plaintiffs rely on *Hughes v. Gulf*

*Interstate Field Servs., Inc.*, 878 F.3d 183, 192 (6th Cir. 2017), to contend that

salary basis must be guaranteed to exempt employees "as a matter of right"

(presumably, contract) rather than a "matter of grace."  That is not the law:

subsection 541.604(a) and (b) require only that a guarantee be part of an

"employment arrangement," not an "employment agreement," which was

a conscious change from the pre-2004 regulation's focus on an

"employment agreement."  *See* JA1225. [15]  And § 541.603(a), which is not

cited or considered by *Hughes*, provides that the decisive question is not

---

[15] *See also Baden-Winterwood v. Life Time Fitness*, 566 F.3d 618, 627 (6th Cir. 2009); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 848 (6th Cir. 2012).

one of contract or right, but whether the employer "intend[ed] to pay on a salary basis."

In *Hughes*, employees had received offer letters stating that they would be paid "Salary: $337.00/Day Worked" and had various other evidence that they were strictly day-rate workers. 878 F.3d at 191-92. The court found that "on the record before [it]," there was a genuine issue of fact because the employer's evidence was controverted. *Id.* at 192. It made its observations about "matter of right" only in rejecting the employer's argument that mere receipt of consistent pay was by itself enough to support summary judgment, and reasonably suggested that an enforceable contract would have been required to overcome plaintiffs' considerable evidence. *Id.* at 191-92, 193 n.7. *Hughes* thus does **not** hold that salary basis must be legally enforceable by employees in all cases.

The essential background case for understanding the establishment or potential loss of salary basis under FLSA is not *Hughes*, but rather *Auer v. Robbins*, 519 U.S. 452 (1997), in which the Supreme Court endorsed DOL's stated view that an employee's pay is "subject to reduction" within the meaning of salary basis only if the employer had "an actual practice of making… [improper] deductions or an employment policy that creates a

42

'significant likelihood of… [such] deductions." 519 U.S. at 461. The Court found that DOL's approach rejected a requirement of actual deductions, "but in their absence it requires a clear and particularized policy — one which 'effectively communicates' that deductions will be made in specific circumstances." *Id.* In *Auer*, this standard was not met because the policy on which the Plaintiffs relied did not effectively communicate that improper deductions would be made because it also applied to non-exempt employees. *Id.* at 462. *Auer* was applied by the Court in *West v. Anne Arundel County*, 137 F.3d 752 (4th Cir. 1998), where a general policy permitted pay deductions for disciplinary reasons but did not apply specifically to exempt employees. *Auer* was decided under the DOL's pre-2004 regulations, but remains a useful guidepost for understanding the new 29 C.F.R. § 541.603, and when pay is "subject to reduction" under 29 C.F.R. § 541.602(a), as that language was retained from the prior 29 C.F.R. § 541.118, JA1224-1226.

The City recognizes that *Auer*'s holding on deference to administrative agencies has since been limited, per *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). The new § 541.603, however, is a deliberate departure from *Auer*, and is now subject to full deference under *Chevron U.S.A., Inc. v.*

43

*Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See* 69 Fed. Reg. 22,122, at 22,180 ("The final rule represents a departure from the Department's position in *Auer*…").  Compared to *Auer*, § 541.603 now further restricts the range of circumstances under which an employer will be deemed to have violated salary basis.

The new, modern regulation, in contrast to *Auer*, provides for the loss of the exemption only where "[a]n employer… *makes* improper deductions [and] the facts demonstrate that the employer did not intend to pay employees on a salary basis," 29 C.F.R. § 541.603(a) (emphasis added), or "[i]f the facts demonstrate that the employer has an actual practice of making improper deductions," *id.* § 541.603(b).  Other subsections of § 541.603 allow employers to escape the loss of exemption in the event of "isolated or inadvertent" deductions, *id.* § 541.603(c), and provide that the section "shall not be construed in an unduly technical manner so as to defeat the exemption," *id.* § 541.603(e).

**Thus, "[i]nstead of *Auer*'s "'practice or policy' standard, the ultimate inquiry is now just 'practice.'"** *Escribano v. Travis Cty.*, 947 F.3d 265, 274 (5th Cir. 2020) (citing 69 Fed. Reg. 22,122, at 22,180).  Defeating exemption is thus now **more** difficult for plaintiffs to achieve than it was

44

under *Auer*.  In *Escribano*, "The County never docked the plaintiffs' pay,

nor does any evidence show that other detectives had their pay reduced.

Because the detectives 'cannot demonstrate that [their] pay was actually

subject to improper deductions,' the County was entitled to judgment as a

matter of law on this question."  947 F.3d at 274 (citing cases, including *Litz*

*v. Saint Consulting Grp., Inc.*, 772 F.3d 1, 4 (1st Cir. 2014)).  The City has

made the corresponding showings here, and was and is therefore entitled

to judgment for the same reasons.

   *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039 (8th Cir. 2020), relied

on by the District Court, also supports the City's position.  Dassault had

made potentially improper deductions from the pay of 7 of 18 plaintiffs,

but the court found that salary basis was not subject to summary judgment

for either party on those facts, and expressly accepted that an absence of

actual deductions would have been decisive, *id.* at 1045.  It also explicitly

rejected the suggestion attributed to *Hughes* that salary basis must be

enforceable by employees: "we do not agree."  961 F.3d at 1048.  *Coates*

found that salary basis was not required to be contractual on the sensible

ground that the DOL's 2004 revisions had removed the reference to

"employment contract" previously contained in 29 C.F.R. § 541.118, in

favor of "employment arrangement," which term is now used in both subsections of the modern regulation, § 541.604.  Thus the word "guarantee" in the same subsection, the court concluded, should be "read as a shorthand statement of the governing 'not subject to reduction' standard in 29 C.F.R. § 541.602(a)."  961 F.3d at 1048.  *Escribano* and *Coates* are thus consistent with the current DOL regulations, where Plaintiffs' interpretation of *Hughes* is not.  *Accord Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 759-60 (3d Cir. 2023) (FLSA salary basis rules "prohibit[] an *actual* and improper deduction from an employee's salary") (emphasis in original).

Plaintiffs' cause on this point is not helped by their string citation on page 25 of their Brief to inapplicable cases.  *McGuire v. City of Portland*, 159 F.3d 460, 461-61 (9th Cir. 1998), actually held for the defendant employer against fire department Battalion Chiefs under the *Auer* case, finding there was no substantial likelihood of a disciplinary policy being enforced to impose improper salary deductions.[16]  Four additional district cases cited

---

[16] Of the unreported cases, *Rodgers v. Basin Sch. Dist. No. 72*, 2006 U.S. Dist. LEXIS 87716 (D. Idaho Dec. 4, 2006) is an unreported motion to reconsider, cites *McGuire* as requiring a contractual guarantee even though neither

in a related section at pages 33-34 of Appellants' Brief are also factually

inapposite—in each case, as in *Hughes*, there was either explicit evidence

that employees were paid solely on an hourly or day rate, or a failure by

the employer to make any showing of an operative guarantee.

Here, by contrast, the Plaintiffs resist the City's evidence of a

guarantee primarily by citing, at pages 4-6 and 26-27 of their Brief, Personal

Action Forms that merely list *both* an annual salary and an hourly rate,

JA993-1009, the latter of which was obviously necessary and in fact used to

pay straight-time overtime.  Plaintiffs' evidence here thus does not

undercut either Bosse's Affidavit or the City's payroll records showing the

actual operation of a guarantee.

Even if Plaintiffs' contention that their receipt of fixed salaries must

be a "matter of right" were correct, it would be satisfied in the Fourth

Circuit by such an understanding being "implied in fact," consistent with

---

word appears there, and was based in part on an employer policy that
specifically identified the Plaintiff as being paid hourly.  *Id.* at *11.  *Martin
v. Rush, LLC*, 2021 U.S. Dist. LEXIS 12602 (E.D. Tex. Jan. 22, 2021), is also
unreported, and there was no evidence of any kind that the Plaintiff was
guaranteed any amount per week without regard to hours worked, *id.* at
*19-20.  And like *Hughes*, neither case cited nor considered the effect of
§ 541.603 requiring actual deductions as evidence of an intention not to pay
on a salary basis.

*Mayhew v. Wells*, 125 F.3d 216, 219-20 (4th Cir. 1997) (finding a "clear

mutual understanding" implied for purposes of fluctuating workweek

where it was clear that employees understood the payment plan).  *See also*

JA385 (in Bosse Dep., Ex. 4) (advising employees including Plaintiffs, who

were all employed at the time, that "all Suppression personnel who are on

shift work receive 106 hours of regular time pay every paycheck regardless

of the hours worked or scheduled"), *discussed at* JA346-349.  The

requirement of a "clear and mutual understanding" under 29 C.F.R.

§ 778.114 is clearly more demanding than that of § 541.603 that a guarantee

merely be part of an "employment arrangement," which encompasses

employees' passive acceptance.  DOL continues to use "clear [and] mutual

understanding" in a 2020 revision of § 778.114, so it knows how to require

mutuality where needed.  Here, in any event, the Plaintiffs have helpfully

documented their understanding of the City's pay system in their

affidavits.  JA1327-1356 (¶¶ 7-8).  Plaintiffs clearly understood (or should

have understood) the guarantees they received because they operated

frequently.

    Thus, actual deductions from the relevant 80- and/or 106-hour

guarantees would be required in order for Plaintiffs to defeat salary basis,

at least here where the City clearly intended to pay on a salary basis.

Plaintiffs effectively agree that such deductions did not occur, as they cite

only the City's irregularity in issuing irrelevant annual "true-ups," as

discussed below.

**III.  Plaintiffs identify no improper deductions from Plaintiffs' pay, nor any policy of making the same, that would defeat salary basis.**

Plaintiffs also assert two other issues that they contend refute the

City's evidence of payment on a salary basis: the City's occasional omission

to make certain annual "true-up" payments when scheduled operational

hours fell a few hours short of 2912 in 52-week periods corresponding

roughly to calendar years, and at pages 5, 12, and 20 of their Brief, a 2003

memorandum stating that that the City follows an "hours paid" versus an

"hours worked" policy, JA1010-1015.  Neither point establishes what

Plaintiffs contend it does.

**A.  Plaintiffs' contentions regarding the City's omission to make *annual* "true-up" payments are irrelevant because the City has not relied on those payments to establish salary basis.**

At pages 37-39 of their Brief, Plaintiffs suggest that the absence of

annual "true-up" payments are an improper deduction.  They rely on the

City's declaration of, and then apparent failure to consistently make, such

payments to fire suppression (that is, operational) personnel whose actual scheduled hours fell slightly short of the expected average of 2912 hours over certain periods of 52 weeks (or 26 pay periods, or 364 days) that corresponded roughly (but not exactly) to calendar years.[17]

Plaintiffs' focus on the City's annual "true up" to try to establish improper deductions is misplaced because the record shows the Plaintiffs' receipt of a sufficient regular salary on a bi-weekly or other shorter-term basis, before and without regard to any annual payments. The threshold of 2912 hours per year (the amount quoted on Plaintiffs' personnel forms), is slightly higher than the 106-hour per pay period amounts that the City ensured were paid to operational Battalion Chiefs in each individual two-week pay period. These minimum payments total "only" 2756 hours per year (53 hours x 52 weeks = 106 hours x 26 pay periods = 2756). It is those slightly lesser payments (or potentially the total minimum schedule of 216 hours every 28 days) on which the City relies to establish salary basis,

---

[17] The figure of 2912 hours is based on the fact that operational personnel (including Battalion Chiefs) are regularly scheduled for three out of every nine days, and thus an average of 121⅓ 24-hour shifts every 52 weeks, thus 121⅓ x 24 = 2912 hours.

which is why the annual true-up payments were not even mentioned in the City's Motion for Summary Judgment.  JA56-85.

Plaintiffs are thus barking up a meaningless tree, because § 602(a) does not require that the entirety of exempt employees' pay (even the entirety of their pay for normally scheduled hours) consist of the "predetermined amount" constituting their salary.   Plaintiffs' contentions are based on an unstated assumption to the contrary.  However, that assumption (or contention) has no basis in the text of the regulations.  The mere fact that the City ever desired to make such payments is actually *supportive* of its intention to pay the Plaintiffs on a salary basis, as it shows the City's concern (however misplaced) that employees should receive an entirely consistent annual income.  The annual true-up issue also has no application to administrative Battalion Chiefs.  *See* JA1016-1018 (applicable to "Suppression employees" only).[18]

---

[18] Plaintiffs also relied below on a delay in the payment of certain overtime to Chief Kelly in July and August of 2022.  However, as explained at JA63 and JA75-76 (City's MSJ), this event did not involve a deduction from salary, was addressed at least reasonably promptly (out-of-sequence check shown at JA124), and was internally investigated, *see* JA1227.  Plaintiffs do not rely on this event on appeal.

### B.    Plaintiffs' reliance on a 2003 memorandum is misplaced.

Plaintiffs' reliance on a 2003 City memorandum as inconsistent with salary basis is also misplaced, and not merely because 29 C.F.R. § 541.603 now requires actual improper deductions to defeat salary basis.  Even under *Auer, supra*, the 2003 memorandum would be insufficient to help the Plaintiffs, because it does not provide for improper deductions, it has no clear application to exempt employees, and there is no evidence that it has never been interpreted or applied to allow or compel improper deductions.

Plaintiffs focus on a single sentence stating the City followed an "'hours paid' versus an 'hours worked' policy."  From its date, this sentence appears to refer to a practice of counting paid leave as hours worked in applying overtime thresholds.  Such a practice was then (and is now) optional for employers under FLSA, even as to non-exempt employees.  *See* DOL Field Operations Handbook ("FOH"), ¶ 32d03c.[19] However, counting paid leave hours toward overtime thresholds had, just recently before 2003, become required for non-exempt fire suppression

---

[19] https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-32#B32d03 (retrieved Dec. 15, 2023), *linked from* https://www.dol.gov/agencies/whd/field-operations-handbook/ (same).

employees in Virginia, by 2001 HB 2712 (JA1268-1270), which is now Virginia Code § 9.1-703 and was passed in 2001.

Plaintiffs interpret or characterize "an 'hours paid' versus an 'hours worked' policy" as indicating or suggesting that Plaintiffs are not paid on a salary basis within the meaning of the FLSA, but it implies nothing of the sort. Plaintiffs have (and have cited) no evidence that the cited language means anything different from the natural interpretation that the City had adopted a policy similar to that mandated by HB 2712, for some or all employees. Nothing about such a policy is relevant to the Plaintiffs' salary basis status.

## IV. Plaintiffs' pay is consistent with the "reasonable relationship" test.

Finally, as their last attack on salary basis, Plaintiffs argue at pages 40-46 of their Brief that the City's 106- and 80-hour guarantees fail the so-called "reasonable relationship" test of 29 C.F.R. § 541.604(b). Subsection 604(b) requires that "the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate *for the employee's normal scheduled workweek*." (emphasis added). Per DOL Opinion

Letter 2018-25[20], and consistent with the example given in the regulation, a "reasonable relationship" exists if the ratio of the above-described normal earnings to the relevant guarantee does not exceed 1.5. For comparison, § 541.604(b) explicitly approves a guaranteed amount of $725 for an employee paid $210 per shift who "normally works four or five shifts each week" (1050/725=1.4483).[21] The Department of Labor's rule allows some latitude for the ratio to be slightly or occasionally above 1.5. *See* DOL Opinion Letter 2018-25.

---

[20] https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/2018_11_08_25_FLSA.pdf. DOL opinion letters are informal but "constitute a body of experience and informed judgment" and are accordingly "entitled to considerable weight." *Blake v. Broadway Servs.*, 2020 U.S. Dist. LEXIS 60100, at *27 n.5 (D. Md. 2020) (citing cases).

[21] *Accord* U.S. Department of Labor Field Operations Handbook ("FOH"), Ch. 22, ¶ 22h09 ("There is a reasonable relationship between the two amounts if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned rate for the employee's normal scheduled workweek," and "A 1.5-to-1 ratio of actual earnings to guaranteed weekly salary is a 'reasonable relationship'"). https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/FOH_Ch22.pdf (retrieved Dec. 15, 2023), *linked from* https://www.dol.gov/agencies/whd/field-operations-handbook.

### A.    Plaintiffs use the wrong formula to measure the reasonable relationship.

Plaintiffs compute annual "reasonable relationship" ratios for themselves in excess of 1.5, JA1199-1201 (which is excerpted on p. 45 of Appellants' Brief), only by using their total compensation as the numerator in place of their earnings for "normal scheduled workweek[s]." This substitution is contrary to the express language of 29 C.F.R. § 541.604(b), and would permit them to void their own exemptions by volunteering for extra paid hours. They contend that Judge Hilton's adherence to the regulatory text is "radical." Appellants' Brief at 42.

Instead of using their "usual earnings… for [their] normal scheduled workweek" as the regulation clearly commands, Plaintiffs use their *total* earnings, some of which include relatively large amounts of overtime. They do this even though there is no controversy that their normal or regular work schedule was the rotating 9-day schedule in which they work only days 1, 3, and 5. This is enough by itself to invalidate Plaintiffs' analysis, but JA1199-1201 further distorts the results by comparing annualized total compensation figures to non-annualized partial years of salary data, and by ignoring the evidence of a guarantee to administrative

Battalion Chiefs, *compare* JA209 (Bosse Aff. ¶ 6).  They did only one thing right: averaging over long periods.  *Accord Blake*, *supra* n.20, 2020 U.S. Dist. LEXIS 60100, at *27-28 ("cherry pick[ing] the highest paying weeks and calculat[ing] those ratios" would "pervert[] the purpose of the test").

### B.    Measured properly against payment for their normal work schedules, there is no genuine dispute that the required relationship test is satisfied.

Neither side challenges or questions DOL's 1.5 threshold ratio defining a "reasonable relationship."  Using their normal schedule as the numerator, the Plaintiffs' pay passes this test easily.  As Judge Hilton noted, an operational Battalion Chief could have as many as 72 regular hours (three 24-hour shifts) in a week, for which only 53 hours pay would be guaranteed, creating a ratio as high as $72/53 = 1.3585$ for that week in isolation.  But the correct computation for a two-week pay period can never exceed $127/106 = 1.198$ (because 127 is the largest number of scheduled hours that can be *paid* in a two-week pay period), and for a 28-day pay cycle, $233/212 = 1.099$ (because the maximum number of scheduled hours in a 28-day pay cycle is 233, not 240, per JA209, Bosse Aff. ¶ 4).  The ratio will be only $56/53$ (or $112/106$ or $2016/1908$) $= 1.0566$ over any continuous period of 36 weeks (and for longer periods, will vary randomly above or

below that figure, but only in small increments), and for a period of 52 weeks, not more than 2928/2756 = 1.0624. The ratio is in fact 1.0 at all times for administrative Battalion Chiefs, who simply received their full salary amount every two weeks while their scheduled hours never varied.

Plaintiffs rely in part on DOL Opinion Letter 2018-25, and a variety of energy industry cases, all of which (including the opinion latter) are distinguishable because the employers did not (and apparently could not) assert that there was any "normal scheduled workweek." In the opinion letter, the employer had guaranteed only 30 hours' pay per week to "engineers and senior designers" at $70 an hour, thus $2,100 a week, but told DOL that these employees' work hours were "virtually impossible to predict" due to varying requirements. *Id.* at 1. Unlike in this case, there is no indication in the Opinion Letter that the employer ever indicated the existence of *any* standard or normal schedule. The employer also advised that at least one employee's average weekly earnings in a particular year had been $3,761, which exceeded the guarantee by a ratio of 1.79. In these circumstances, DOL advised that using annual average earnings to compute the ratio was "a reasonable method." *Id.* at 2.

Each of the four unreported cases cited at page 43 of Appellants' Brief arose in the energy industry in Texas or Louisiana, as *Helix* did, and not in any of them did the employer rely, as the City does here, on the existence of a "normal, scheduled workweek." *Sonnier v. Recon Mgmt. Servs. Inc.*, 2022 U.S. Dist. LEXIS 8086 (W.D. La. Jan. 14, 2022) actually found that the plaintiff employee's pay was consistent with the reasonable relationship test, and held for the employer based on an absence of any improper deductions, *id.* at *18, *25.[22] Isolated statements referring to normal earnings without regard to a "normal scheduled workweek" arise from courts (including the *Helix* Court) using the first sentence of § 541.604(b), which refers only to "the amount actually earned," as a summary of the rule – which is without consequence where there is no normal workweek claimed. But there is no ambiguity in the regulation, as the second sentence provides clearly, "The reasonable relationship test *will be met* if the weekly guarantee is roughly equivalent to the employee's usual earnings at

---

[22] The other cases are *Guilbeau v. Schlumberger Tech. Corp.*, 2023 U.S. Dist. LEXIS 117614 (W.D. Tex. July 7, 2023); *Vaughn v. Wingo Serv. Co.*, 2022 U.S. Dist. LEXIS 142105 (S.D. Tex. Aug. 4, 2022); and *Gentry v. Hamilton-Ryker IT Sol., LLC*, 2022 U.S. Dist. LEXIS 38398 (S.D. Tex. Mar. 4, 2022).

the assigned hourly, daily or shift rate for the employee's *normal scheduled workweek*." 29 C.F.R. § 541.604(b) (emphasis added).

### C. The City's guarantees bear a "reasonable relationship" to usual pay for "normal scheduled hours" under any reasonable analysis.

In considering the importance of subsection 604(b)'s limitation to "normal scheduled hours," the Court may wish to note that large majorities of most of the Plaintiffs' overtime during the relevant statutory period have been **voluntary**. Per the figures provided by Chief Cross in JA1273, even if all potentially involuntary overtime were deemed part of the "normal scheduled workweek," the highest possible "reasonable relationship" ratios, using Chief Cross' involuntary overtime data from 2022, would be $(72+4.625)/53 = 1.4457$ for an isolated week, $(127+9.25)/106 = 1.2854$ for a pay period, and $(233+18.5)/212 = 1.1863$ for a 28-day work cycle. Averaged over a year, as Plaintiffs propose, this ratio would not exceed $(2928+26*9.25)/2756 = 1.1497$.

The significance of the Plaintiffs' large proportion of voluntary overtime is that it under their proposed rule, employees could have substantial control over their own "reasonable relationship." This would create an incentive for plaintiffs in future cases to manipulate the test by

volunteering for excessive overtime, which is presumably why the DOL regulation explicitly specifies the use of "the employee's *normal scheduled* workweek" (emphasis added) – indicating that the workweek used must be both "normal" and "scheduled."

The City does not suggest that this analysis is necessary for it to prevail, as the phrase "normal scheduled workweek" unambiguously excludes *all* overtime. That the Plaintiffs' overtime is not part of their "normal scheduled workweek" within the meaning of § 541.604(b) is also shown by the fact that in such assignments they are at least generally not supervising their normal shift and Battalion, since they are working additional hours or shifts outside that normal assignment. For administrative Battalion Chiefs who work operational duty overtime, they are of course not even performing their normal job. Thus the "reasonable relationship" test would be met even under the worst possible conditions – even if all overtime that is not expressly voluntary were included in the "normal scheduled workweek," even if the highest possible Plaintiff-year were used as the assumed amount of involuntary overtime, and even if the ratio were otherwise measured over the shortest possible period of time. The City's evidence thus shows that it is not possible for a properly-

computed ratio of "usual pay… for the employee's normal scheduled workweek" to guaranteed amounts to exceed the permitted ratio of 1.5, even for short periods, for any of the Plaintiffs.

Unlike in *Helix*, where it was undisputed that the reasonable relationship test was *not* satisfied (perhaps because there was no "normal, scheduled workweek," as in DOL Opinion Letter 2018-25), here it is clear that the reasonable relationship test is in fact satisfied. Plaintiffs' contention that their pay was too variable, in some vague sense, to be deemed a salary can only be considered under the specific and objective "reasonable relationship" test of 29 C.F.R. § 541.604(b), which is decisively resolved in the City's favor as a matter of simple arithmetic.

## <u>CONCLUSION</u>

For these reasons, this Court should affirm the District Court's judgment as to both the granting of the City's motion for summary judgment and the denial of the Plaintiffs' motion for summary judgment.

Dated: December 20, 2023                Respectfully submitted,

                                        */s/ David F. Dabbs*
                                        Brian D. Schmalzbach
                                        David F. Dabbs
                                        MCGUIREWOODS LLP
                                        Gateway Plaza
                                        800 East Canal Street
                                        Richmond, VA 23219
                                        ddabbs@mcguirewoods.com
                                        bschmalzbach@mcguirewoods.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,699 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, 14-point Book Antiqua font using Microsoft Word.

*/s/ David F. Dabbs*
David F. Dabbs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 20, 2023, the foregoing was filed with

the Clerk of the United States Court of Appeals for the Fourth Circuit using

the appellate CM/ECF system, which will also serve counsel of record.

<u>*/s/ David F. Dabbs*</u>
David F. Dabbs